324 So.2d 475 (1975)
CAJUN ELECTRIC POWER COOPERATIVE, INC.
v.
LOUISIANA POWER AND LIGHT COMPANY.
No. 7204.
Court of Appeal of Louisiana, Fourth Circuit.
December 15, 1975.
Rehearing Denied January 13, 1976.
John Schwab, Baton Rouge, for plaintiff-appellant.
Monroe & Lemann, Andrew P. Carter, New Orleans, for defendant-appellee.
Before LEMMON, BOUTALL and BEER, JJ.
*476 BEER, Judge.
Cajun Electric Power Cooperative, Inc., (hereafter, Cajun), plaintiff-appellant, filed an original petition in the Civil District Court for the Parish of Orleans seeking to compel Louisiana Power & Light Company (hereafter, LP&L), defendant-appellee, to arbitrate a dispute which arises in the dealings between them covered by a contract dated May 29, 1970. The contract affirmatively provides that certain particularized disputes which arise will be arbitrable. In response to the petition seeking to compel arbitration, LP&L filed an exception of no right of action which was augmented, ex proprio motu on the part of the trial judge, by an exception of no cause of action. Cajun now appeals from the maintaining of that exception of no cause of action by the trial court.
The record is composed of the various pleadings, memoranda in support thereof, and certain exhibits in the form of the contract between the parties, letters and other pertinent documents. It is sufficiently complete for us to deal with the correctness of the trial court's ruling on the exception but not with the main point in controversyCajun's right to arbitration of the dispute which has arisen regarding interpretation of a particular section of the contract.
We reverse the judgment of the district court, overrule the exception of no cause of action and remand.
LP&L and Cajun confected a contract under which LP&L would supply Cajun with designated quantities of electrical power at various points of delivery. Sections 1.02[1], 1.03[2], and 1.05[3] of the contract contain *477 provisions for determining the quantity of power to be delivered to existing and newly designated delivery points. Section 1.04[4] provides for arbitration of disputes which arise under certain conditions described in portions of Sections 1.02 and 1.03.
Cajun characterizes the request which precipitates this controversy as one seeking delivery of electrical power to a new delivery point in the Gallion-Bastrop area as contemplated by Sections 1.02 and 1.03. In the correspondence attached as exhibits to plaintiff's petition both parties treat the demand in terms of it being with respect to a new delivery point. There is, however, rather clear indication from the exchanges of correspondence that the creation of such new delivery point in the Gallion-Bastrop area could, for various technical and economic reasons, be directly related to a reduction in power delivered to another point also covered by the contract. This latter circumstance is dealt with under Section 1.05, and the method of dealing with controversies arising under this section is clearly beyond the express scope of the arbitration provision in Section 1.04. Thus, while an arbitrable controversy appears to arise in the course of Cajun's quest for a new point of delivery as contemplated by Sections 1.02, and 1.03, it also, by implication, appears to arise as a result of the additional request that there be corresponding reduction in power from an existing point of deliverya nonarbitrable controversy.
On the basis of the record now before us, we do not find the request for the new delivery point sought by Cajun, and the irreconcilable differences directly generated thereby, so inextricably intertwined with the requested reduction of capacity at the existing Gallion-Bastrop delivery point to cause each contention to lose its specific identity. And, since issue identity is, thus, maintained intact, so too should be the method of controversy resolution which is ascribable, contractually, to each issue.
We perceive that both parties have heretofore attempted to deal with each other in good faith and understand, we think, the strength of conviction on both sides. Nevertheless, Cajun's contended right to arbitrate the irreconcilable differences that have been generated by its request for a new delivery point has been unwittingly combined with its other request. LP&L has made a yeoman effort to articulate that the two are thereby inextricably intertwined and, accordingly contends that the right to arbitrate the controversies arising therefrom cannot be subject to arbitration.
We agree that an intractable and insistent combining of nonarbitrable issues with those which are arbitrable must be held to have cracked the somewhat fragile vessel *478 of arbitrability. We also agree with able counsel for LP&L that controversies arising under Section 1.05 are not arbitrable and contractual willingness to arbitrate expressly with respect to Section 1.02 and Section 1.03 cannot be implied to exist with respect to Section 1.05.
The issues appear to be related but separable. Almost all the matters dealt with in the extensive contract are, to a degree, correlated. It seems unnecessary to observe that the very nature of a contract such as this between parties such as these is, essentially, a document containing correlated provisions. The two contentions appear sufficiently differenton their faceto allow for the separate treatment thereof.
We therefore conclude that the petition does state a cause of action to arbitrate the controversy arising under the last sentence of Section 1.02, and Section 1.03. We will, therefore, overrule the exception. The state of the record precludes our ordering the arbitration at this time. LSA-R.S. 9:4203 provides that the court shall order arbitration if it is "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not an issue."
In Bartley, Inc. v. Jefferson Parish School Board, 302 So.2d 280 (La.1974) the Supreme Court considered exceptions of no cause of action, prematurity and waiver. The only point of distinction between Bartley and the present case is the status of the record. In Bartley the court stated:
"In this case, there is no denial that the general contract between Bartley and the School Board included an agreement to arbitrate. It is clear that neither the School Board nor American has submitted to arbitration, although Bartley has requested it."
In the case before us the contract had been placed in evidence and is conceded by the parties to be a contract containing an agreement to arbitrate in a particular instance. The difference that exists between the two cases is that here the record does not disclose an unconditional refusal of LP&L to arbitrate, but rather a conditional refusal based upon its interpretation that such must necessarily involve unarbitrable issues.
LP&L should be given an opportunity to agree to the proposed arbitration or refuse. We remand this matter to the district court (overruling the exception) solely for the purpose of determining if LP&L will refuse to arbitrate.
The law favors an interpretive effort toward upholding arbitration. The purpose of the Louisiana Arbitration Law, LSA-R.S. 9:4201 et seq., had been discussed as follows:
"* * * The act may prove useful in making certain that contracts providing for arbitration are carried out and may deter those who, having provided for arbitration, would later prefer to evade this provision and burden the court with matters which might better be settled through arbitration with time and trouble saved for all parties concerned."[5]
And this court has recently observed that:
"The parties have entered into an enforceable agreement which provides for arbitration, and between them it is binding as the law. The court will not permit the evasion of this provision."Wright v. Round the Corner Restaurants, 252 So.2d 341 (La.App.4th Cir. 1971)
Where there is doubt, the general rule is that it should be resolved in favor of, not against, arbitration. See: Southern Bell Tel. & Tel. Co. v. Louisiana Power & Light Co., 221 F.Supp. 364 (EDLa., 1963); Texas Gas Transmission Corp. v. *479 International Chemical Workers Local Union No. 187, AFL-CIO, 200 F.Supp. 521 (WDLa., 1962).
We do not, in any event, gainsay LP&L's clear right to litigateif necessaryany dispute regarding the reduction of capacity at the Gallion-Bastrop delivery point.
Accordingly, the judgment of the Civil District Court for the Parish of Orleans dated April 18, 1975 maintaining the exception of no cause of action to the petition to compel arbitration is reversed and that exception is overruled; the matter is remanded for further proceedings not inconsistent with this opinion. Cost of this appeal to be paid by appellee.
Reversed and remanded.
LEMMON, J., concurring.
LEMMON, Judge (concurring).
For different reasons, I agree that the exception of no cause of action should have been overruled. I therefore concur in the result.
The crucial issue in my opinion is whether the question of arbitrability of this particular contractual dispute should be decided by the court or by the arbitrator.
As to what issues of a demand for arbitration are triable by the court, R.S. 9:4203 provides in pertinent part:
"The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not an issue, the court shall issue an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. If the making of the arbitration agreement or the failure or refusal to perform is an issue, the court shall proceed summarily to the trial thereof."
In the Bartley case, the contract provided for arbitration of "[a]ll claims, disputes and other matters in question arising out of, or relating to, this Contract or the breach thereof." It was apparent from the contract that the making of an agreement for arbitration was not an issue.
The parties in the present case, however, agreed to submit to arbitration only those disputes over certain limited areas of the contract. In cases in which the arbitration provision restricts arbitration to disputes relating to specified matters, arbitrability is generally to be determined by the court. Domke, Commercial Arbitration § 8.01 (1968). Since the arbitrator derives his authority solely from the contract, his right to arbitrate the dispute must be clearly established by the contract. See generally, Domke § 12.01. Any question as to whether the parties intended to submit a specific dispute to arbitration should be determined by the court. Otherwise, the arbitrator would be called upon to determine his own authority.
The arbitration provision contained in paragraph 1.04 provided for arbitration only of those disputes arising under the last sentence of paragraph 1.02 or the first sentence of paragraph 1.03, both of which refer to providing new capacity in excess of normal load growths or to establishing new points of delivery. Paragraphs 1.02 and 1.03 differ principally as to which party shall pay initially for the construction, and the standard for determining which paragraph applies (and therefore who advances construction funds) is whether "sound engineering and economic principles would dictate the installation of such additional capacity or (sic) new Points of delivery". Thus, it appears the parties clearly intended to use arbitration principally for determining this objective standard in case of dispute.
*480 The dispute arose over the following request by Cajun:
"Cajun Electric Power Cooperative, Inc., requests that Louisiana Power and Light Company provide Northeast Louisiana Power Cooperative with a 13.8 KV point of delivery in the vicinity of Gallion, Louisiana. An in-service date of June 1, 1975, is intended with an estimated load of 2000 KW being carried by the delivery point initially. Said arrangement would reduce the load on the existing Bastrop delivery point to an estimated 2000 KW demand also."
LP&L proposed to establish the delivery point upon Cajun's advancing $25,000.00 on a refundable basis to pay the cost of constructing a line to the metering point, but also observed that the establishment of the delivery point "will accelerate approximately $200,000 of additional facilities in the Gallion Substantion for a period of approximately three years" and requested payment on a non-refundable basis "for the carrying charges on the $200,000 investment".
Cajun notified LP&L of its desire to arbitrate the dispute, but LP&L replied that the request was one for substitution of delivery points, not falling within paragraphs 1.02 or 1.03. Cajun then filed this suit.
The case was set for trial as a summary matter, but the matter never proceeded to trial because the trial court maintained an exception of no cause of action. In this respect I agree with the majority that the trial court erred. I cannot determine from the petition and exhibits, without additional evidence, whether Cajun's request was one to establish a new delivery point under either paragraph 1.02 or 1.03, or was a request to reduce capacity at one delivery point with delivery of the abandoned capacity to the same customer at another delivery point under paragraph 1.05.[1] In my opinion the trial court should not have decided the issue of arbitrability on an exception without evidence, since the court could not be "satisfied (on this record) that the making of the agreement for arbitration. . . is not an issue". The court should have "proceed(ed) summarily to the trial thereof." R.S. 9:4203.
I would therefore remand and order a trial on the merits of the issue of arbitrability, at which evidence may be adduced in explanation of the technical terms necessary for the intelligent interpretation of the contract and of the request and for the determination based on this evidence as to whether the parties in their contract intended the particular dispute as one subject to arbitration.
LEMMON, Judge (dissenting from the denial of application for rehearing).
I have reconsidered the majority and concurring opinions on original hearing and am now convinced that both opinions went beyond the scope of the appellate issues before the court.
The trial court judgment maintained an exception of no cause of action. The record then contained only a petition to compel arbitration (with the contract and some correspondence attached) and an exception of no cause of action. Since the trial judge maintained the exception, no evidence was taken at the summary hearing. Therefore, the only thing before us on appeal was the correctness of the judgment maintaining the exception. All three members of the panel agreed (and LP&L virtually concedes in its application for rehearing) that the exception should have been overruled; the members of the panel, however, disagreed as to the action to be taken on remand.
*481 I am now convinced that the suggested action on remand (in both opinions) constituted pure dicta. The issue as to what the trial court should do on remand was not before us, and our suggestions cannot constitute an authoritative holding as to the trial judge or any future panel of this court.
I therefore vote to grant a rehearing in order to delete any portion of the opinion and decree which goes beyond the issue of overruling the exception.
NOTES
[1] "1.02 Company will supply the present power requirements of Customer's Member Cooperatives as defined in the exhibits attached. Upon reasonable advance written notice from Customer, Company will provide additional capacity at the Points of Delivery specified as Member Cooperatives Normal Load Growth warrants such additions. Normal Load Growth shall mean growth in kilowatts of maximum 15-minute demands not in excess of 15% above the highest such demand established at that Point of Delivery during the preceding calendar year. Upon reasonable advance written notice the Company will provide additional capacity for growth over and above the Normal Load Growth at existing Points of Delivery to the extent that, and will establish new Points of Delivery at such points where, sound engineering and economic principles would dictate the installation of such additional capacity of new Points of Delivery if all facilities required to provide service for the affected loads belonged to one supplier."
[2] "1.03 In addition, the Company will, when requested by Customer, provide additional capacity, over and above Normal Load Growth at an existing Point of Delivery or establish a new Point of Delivery where the facilities necessary for such additional capacity or additional Delivery Point cannot be justified under the standards of the last sentence of paragraph 1.02, provided that Customer gives assurance of revenue necessary to justify the investment required for the facilities or makes a cash advance equal to the total cost of such facilities, or a combination of revenue assurance and cash advance. Any such cash advance shall be refunded by the Company at the rate of 1/10th of the amount of such advance each year until total refund is completed or until said facilities are, at the election of Customer, no longer utilized to provide service to Customer, whichever is sooner. The ownership of said facilities shall remain with the Company."
[3] "1.05 Upon reasonable advance written notice to Company, Customer may abandon any Point of Delivery or may reduce the amount of capacity previously specified under this Agreement for any Point of Delivery, provided the capacity so abandoned or reduced is to be delivered to Customer from another Point of Delivery supplied by Company for the same Member Cooperative. Such abandonment or reduction in capacity shall become effective on the date specified by Customer in the notice, but not sooner than 12 months after the date such notice is received by Company; provided that in calculating Minimum Billing Demand under the provision of the applicable Rate Schedule such Point of Delivery shall be billed as though such abandonment or reduction in capacity had not taken place until the thirteenth month following the month in which notice of the reduction in capacity or abandonment is given."
[4] "1.04 disputes arise under the last sentence of paragraph 1.02, or the first sentence of paragraph 1.03, of this Article I, they shall be resolved by arbitration as follows. The issue in dispute shall be certified in writing by the parties and submitted to a Board of three arbitrators for decision, after notice and hearing. One arbitrator shall be selected by each party and the third presiding member of the Board of Arbitration shall be selected by the two arbitrators. In the event they are unable to choose a third arbitrator, either party, or both, may apply to the American Arbitration Association for a list of five persons, each qualified to act as a neutral arbitrator. Promptly after this list is received the Company and Customer shall determine by lot the order in which they will strike names and thereafter, each shall in that order, alternately eliminate one name until only one remains on the list, and that person whose name remains on the list shall become the impartial arbitrator. The Board of Arbitration shall convene as expeditiously as possible to render a decision and the written decision of the Board of Arbitration shall be final and binding upon the parties hereto. The expenses incident to the arbitration shall be shared equally by Company and Customer. If a dispute relates to the first sentence of paragraph 1.03, the Company shall proceed to add the additional capacity and/or establish the requested new Points of Delivery pending the arbitration proceeding." (Emphasis ours.)
[5] From "Comments by Harriet S. Daggett" prefacing provisions of LSA-R.S. 9:4201 et seq., Volume 4, West's LSA Revised Statutes at page 137.
[1] While the request at first blush seems to fit better under paragraph 1.05, the answer to this dispute was not sufficiently apparent (without evidence explaining the economic factors bearing upon Cajun's request) to deny Cajun its day in court to prove its request fell under paragraph 1.02 or 1.03.