773 So.2d 755 (2000)
Hendrick THOMAS and His Wife, Lois Thomas
v.
DESIRE COMMUNITY HOUSING CORPORATION, et al.
No. 98-CA-2097.
Court of Appeal of Louisiana, Fourth Circuit.
July 19, 2000.
*756 Dean Joseph Favret, Anthony J. Russo, Jr., Favret, Demarest, Russo & Lutkewitte, New Orleans, Louisiana, Counsel for Plaintiff/Appellee.
James Austin Gray, II, Gray & Gray, New Orleans, Louisiana, Counsel for Defendant/Appellant.
Court composed of Judge JOAN BERNARD ARMSTRONG, Judge MIRIAM G. WALTZER, Judge MOON LANDRIEU, Judge MICHAEL E. KIRBY, Judge PHILIP C. CIACCIO, Pro Tem.
KIRBY, Judge.
On original hearing, a divided three judge panel vacated the trial court's judgment and remanded the case to the district court with instructions that the trial court order arbitration and stay the proceedings in court pending completion of arbitration. On rehearing before a panel of five judges, we find the defendants waived the right to seek arbitration, and proceed to a discussion of the merits of the case.

STATEMENT OF THE CASE
Hendrick and Lois Thomas filed suit against Desire Community Housing Corporation and others on May 16, 1989 alleging *757 breach of a construction contract for their residence. Defendants filed an exception of prematurity seeking arbitration pursuant to the construction contract. The trial court granted that exception and this court denied plaintiffs' writ application on May 29, 1990. On June 1, 1990 plaintiffs' counsel wrote defendants' counsel concerning matters preliminary to arbitration. Defendants' counsel responded on June 11, 1990, stating that they had a dispute over certain documents, plaintiffs' claim had prescribed, and that if plaintiffs did not drop their suit, defendants would reconvene for malicious prosecution. No arbitration took place as a result of that correspondence and plaintiffs again filed suit in the Civil District Court on June 21, 1990. Thereafter defendants again filed an exception of prematurity for want of arbitration, which was overruled by the trial court on January 28, 1991. No appeal or writ application followed that ruling. Defendants filed an answer and reconventional demand in June of 1991. Discovery and other trial preparations occurred intermittently until trial, which occurred on June 26th and 27th, 1997 and August 20th, 21st and 22nd, 1997. On August 20, 1997 defendants requested a stay of proceedings in order to arbitrate the matter. The request was denied. Judgment was rendered in favor of plaintiffs for a total of $61,633.75.

FACTS:
Hendrick Thomas grew up in the Desire Housing Project in a family of eleven. All of the boys slept in one room and all the girls in another. In 1979 he married Lois Hughes. They each had been married before and together have four children. He is employed by Domino Sugar and she is a school bus driver for the Orleans Parish Public School System.
In pursuit of the American Dream, Mr. and Mrs. Thomas longed for a home of their own, their "Dream House" as they referred to it. They saved their money and looked for a house to purchase. Finding none that was satisfactory, they decided to build. On August 22, 1984 they purchased a vacant lot on Metropolitan Street in New Orleans. Then they scrimped and saved money to build. Not knowing how to go about such things, Mr. Thomas consulted a friend, Mrs. Delores Francois, who was the executive director of Desire Community Housing Corporation. Mrs. Francois put him in touch with an architect, who after consulting with the Thomases, prepared plans for their Dream House.
After consulting with Mrs. Francois about what to do next, Mr. Thomas sought bids from contractors. Only one bid was received and that was from someone who could not do the job at the time, so Mr. Thomas asked Mrs. Francois if she could build the house. She said yes and on October 13, 1987, Mr. and Mrs. Thomas entered into a contract with Desire Community Housing Corporation for the construction of their Dream House for the sum of $62,850.00. Desire also assisted the Thomases with arranging interim financing. The events that followed are reminiscent of the 1940's motion picture Mr. Blandings Builds His Dream House. As Mr. Thomas testified, their dream turned into a nightmare.
In connection with the construction of the residence, Desire contracted with Mr. Willie A. Francois, Mrs. Francois' husband, to be the "consultant-job foreman." Mr. Francois had a regular job as an instructor at the Sidney Collier Vo-Tech School, but he testified that he spent as much as three or four hours a day at the Thomas' home site. This is generally confirmed by Mr. Thomas.
The testimony reveals that Mr. and Mrs. Thomas did not initially go to the site daily. They would drive by and observe the progress from the street. At some point, though, Mr. Thomas had a conversation with a Mr. Mimms, as a result of which Mr. Thomas went to the job site and discovered that instead of ten foot ceilings, the house was framed for eight foot ceilings. He also found that the breakfast bar *758 had not been constructed according to the plans. When the slab was poured, a provision was made in the slab for a door where a bay window was called for in the plans. In addition, the concrete driveway was poured over and around a street drainage catch basin. Plaintiffs' expert in general contracting, Mr. Hotard, testified that a general contractor should never have allowed that to happen. The catch basin should have been replaced with a roll-over type or the driveway should have been moved.
Mr. Hotard noted that the bathroom was not built to original specifications. It is much smaller than called for in the plans. As a result the linen closet is not functional. The Thomases and Mr. Hotard note a number of other defects, such as improperly hung doors, holes in the sheet-rock, visible seams in sheetrock, the hood for the stove not vented through the roof, improperly built soffit and fascia and a problem with low water pressure throughout the house.
Although the problems that Mr. and Mrs. Thomas noted during construction had not been corrected, Mr. and Mrs. Francois prevailed upon them to move into the home because of a fear that the property would be vandalized if it remained unoccupied. Also, the Thomases were feeling a financial crunch associated with maintaining their apartment and having to pay the expenses of the new house. Subsequently a punch list was prepared and Mr. and Mrs. Thomas were assured the problems would be corrected. After some delay the permanent financing was arranged and at the closing the Thomases were referred to the City in order to obtain their homestead exemption.
At this point the dream-turned-night-mare becomes horrific. When Mrs. Thomas went to sign up for the exemption, she learned the City had no record of the house being constructed on the lot. Further investigation revealed that although a building permit had been applied for and issued, there was no record of periodic inspections required pursuant to the building code. Additionally, the City had not issued a use and occupancy permit meaning that the house should not have been occupied. To compound the problems, when a City inspector did inspect the premises he discovered that the spacing of the rafters and ceiling joists was not in accordance with the building code. Subsequently, Mr. Hotard noted that, as constructed, the rafters and ceiling joists did not comply with the plans. The building inspector and Mr. Hotard both indicated that the roof could cave in in a hurricane or strong wind. The City issued a letter to the Thomases informing them they were in violation of@ the building code and were subject to imprisonment for up to six months and a fine of $100.00 per day for each day the violation occurs.
At the conclusion of the trial, the Court awarded damages of $30,000.00 to correct the "various and numerous" defects in construction; $2,500.00 to correct defective plumbing problems; $2,100.00 for expert witness fees; $12,033.75 for attorney fees and nonpecuniary damages of $15,000.00
Defendant has appealed assigning four errors:
1) The trial court erred in presuming that it was the proper forum to decide whether the defendants waived their right to arbitration.
2) The trial court erred in finding that the defendants waived their right to arbitration.
3) The trial court erred in awarding nonpecuniary damages to plaintiffs.
4) The trial court erred by awarding excessive damages.
Plaintiff has answered the appeal seeking an award of additional attorney fees for the appeal.

ASSIGNMENTS 1 AND 2, ARBITRATION
There is no question that the construction contract at issue contains an arbitration clause and that plaintiffs' first *759 suit was dismissed on an exception of prematurity based on the failure to arbitrate. That dismissal was affirmed when this court denied plaintiffs' writ application. After plaintiffs filed the current action, defendants filed another exception of prematurity, which was overruled by the trial court on January 28, 1991. The trial court found that plaintiffs had tried to comply with the previous rulings calling for arbitration but that defendants had "stonewalled" them and that if the suit did not go forward the plaintiffs would find themselves in a "Catch 22" situation.
No appeal or writ application was taken from that ruling. Defendants answered the suit, filed a reconventional demand and for the next six and one-half years participated in discovery and trial preparation. Trial occurred on June 26 and 27, 1997 and on August 20, 21, and 22, 1997. Midway through the trial, defendants moved to stay the proceedings to allow arbitration.
On original hearing, we rejected plaintiffs' argument that because defendants did not seek review of the order overruling the exception of prematurity, they could not now challenge that order. We found that the trial court's decision was not a final, appealable judgment. Further we held that while it may have been permissible for Desire to seek writs, we were referred to no legal authority and we were not aware of any which required Desire to apply for writs.
We were in error.
We recognize that there is a strong public policy in Louisiana favoring the enforcement of arbitration clauses. See Cajun Elec. Power Co-op, Inc. v. Louisiana Power & Light Co., 324 So.2d 475 (La.App. 4 Cir.1975) and Woodson Const. Co., Inc. v. R.L. Abshire Const. Co., Inc., 459 So.2d 566 (La.App. 3 Cir.1984). We also recognize that arbitration is a substitute for litigation and that its purpose is to settle disputes in a fast, inexpensive manner before a tribunal chosen by the parties. See Firmin v. Garber, 353 So.2d 975 (La.1977); National Tea Co. v. Richmond, 548 So.2d 930 (La.1989), Tower Hill Trading Co., Ltd. v. Howard, Weil, Labouisse, Friedrichs, Inc., 96-0463 (La.App. 4 Cir. 1/22/97), 687 So.2d 1096 and Pittman Const. Co., Inc. v. Pittman, 96-1079 (La. App. 4 Cir 3/12/97), 691 So.2d 268, writ denied, 97-0960 (La.5/16/97), 693 So.2d 803. We believe that one who claims entitlement to arbitration cannot make a pro forma request for it, file a reconventional demand and then sit on his rights for six and a half years, participate in litigation and then after an adverse ruling cry "`Kings-X,' the judgment is invalid for want of arbitration." That is the very antithesis of what arbitration is all about.
Admittedly we have been unable to find a Louisiana case on this precise issue. We do note, however, that at least one authority on the subject agrees with this approach.
Once suit is filed, the party asserting the arbitration defense should file a motion to stay the court proceedings and to compel arbitration. [Footnote omitted.] This is the only way that a party may effectively stop a suit and institute arbitration proceedings. [Footnote omitted.] The court must stay the action once it finds that the dispute is referable to arbitration and no other impediments prevent the application of the arbitration clause. [Footnote omitted.] The mandatory character of the rule appears from the statutory wording "shall be stayed" such as that in § 2(e) of the Uniform Arbitration Act. [In Louisiana, See R.S. 9:4202.] A party must appeal a denial of the motion to stay or a motion to compel arbitration. If the party does not do so, and participates further in the litigation, the party will be deemed to have waived its right to arbitration. [citing John Morrell & Co. v. United Food and Commercial Workers International Union, Local 304A, AFL-CIO and CLC, 37 F.3d 1302 (C.A.8, 1994). Italics in original, boldface *760 added.] Domke, Comm. Arbitration § 19.07 (Rev. Ed.).
A case that is somewhat similar to the facts of the case sub judice is Ritzel Communications, Inc. v. Mid-American Cellular Telephone Co., 989 F.2d 966 (8th Cir. 1993). Mid-American had sold a wholly-owned subsidiary to a group of investors known as the Goodwin group. Ritzel was the broker involved in the sale. Ritzel sued Mid-American for its fee. Subsequently the Goodwin group was added as third party defendants. The Goodwin group moved to dismiss the third party complaint or alternatively for a separate trial. Later the group filed a motion to stay litigation and to compel arbitration based on certain provisions of the stock purchase agreement. The district court denied the motion and the Goodwin group appealed. While the appeal was pending, the group continued to litigate in the district court. Specifically it answered the complaint, amended its counterclaim and participated in discovery. The trial lasted six days. All of this activity occurred before the appeal was argued.
The Eighth Circuit found the Goodwin group had waived its right to seek arbitration:
In light of the strong federal policy in favor of arbitration, any doubts concerning waiver of arbitration should be resolved in favor of arbitration. [Citation omitted.] Nevertheless, we will find waiver where the party claiming the right to arbitrate: (1) knew of an existing right to arbitration; (2) acted inconsistently with that right; and (3) prejudiced the other party by these inconsistent acts. [Citation omitted.] Ritzel Communications, Inc. v. Mid-American Cellular Telephone Co., 989 F.2d at 968-969.
The Court had no difficulty finding that the Goodwin group knew of its arbitration rights because it had drafted the agreements at issue. As to the second factor, the Court determined that the group had acted inconsistently with its known arbitration rights because it had substantially invoked the litigation machinery by initially moving for dismissal or alternatively for a separate trial. Additionally, the court found it significant that the Goodwin group had failed to ask the Eighth Circuit for a stay of the lower court proceedings pending appeal and that the group had not sought an expedited appeal:
Arbitration clauses in agreements are designed to resolve disputes without costly litigation. When a party appealing the denial of its arbitration rights ignores the available means to avoid wasteful litigation pending appeal, it is acting inconsistently with those rights. By failing to make the simple effort of requesting a stay in this court and by proceeding to trial on the merits in the district court, the Goodwin group defeated the whole purpose of the arbitration clause on which it claims to rely.... Ritzel Communications, Inc. v. Mid-American Cellular Telephone Co., 989 F.2d at 970. [Emphasis added.]
The Court went on to find the prejudice to Mid-American to be "obvious and substantial" by virtue of its having to participate in a trial, two-thirds of which consisted of its having to put on its case. Id.
The parallels of the Ritzel case to this case are striking. Obviously, defendants knew they had the right to arbitrate since they had successfully filed the exception in the first suit and had re-filed it in this case. When it was overruled on January 28, 1991, defendants had the right to seek writs to this court pursuant to C.C.P. art. 2201 and they could have sought an interlocutory appeal based on irreparable injury. C.C.P. art. 2083. Such an appeal was subsequently specifically authorized by this court in Rauscher Pierce Refsnes, Inc. v. Flatt, 93-1672 (La.App. 4 Cir. 2/11/94), 632 So.2d 807.[1] By failing to do anything *761 to review the district court's overruling of their exception of prematurity and by subsequently filing a reconventional demand, taking part in trial preparation and participating in several days of trial, defendants acted inconsistently with their known right to arbitration. As to the third factor, prejudice to the opponent, this is as obvious and substantial here as it was in the Ritzel case. We find it of no moment that on the third day of trial defendants moved to stay the trial in order to arbitrate. The damage had already been done over the previous six and one-half years, including two full days of trial out of a total of five trial days.
We find the cases cited by Desire in support of its position that it did not waive arbitration distinguishable. In Conagra Poultry Co. v. Collingsworth, 30,155 (La. App. 2 Cir. 1/21/98), 705 So.2d 1280, Collingsworth had tried to arbitrate a dispute with Conagra. Upon the initiation of arbitration Conagra sued in the district court to enjoin the arbitration. The district court ruled in Conagra's favor and Collingsworth appealed. The Court of Appeal reversed and referred the matter to arbitration. Obviously Collingsworth knew of his right to arbitration, did nothing inconsistent with that right and there was no showing of prejudice to Conagra.
In Matthews-McCracken Rutland Corp. v. City of Plaquemine, 414 So.2d 756 (La. 1982) the plaintiff sued the City of Plaquemine, which third partied Riley Stoker Corporation. Riley Stoker timely answered and eighty-eight days later notified the City by letter that it intended to arbitrate. Riley Stoker then moved to stay the proceedings in order to arbitrate. The trial court denied the stay. The Supreme Court found that the eighty-eight day delay was excusable because after filing the answer, Riley Stoker's attorney had been seriously injured in an accident requiring hospitalization for a month. The Court was unable to find any prejudice suffered by the City during the delay.
Our decision in Electrical & Instrumentation Unlimited, Inc. v. McDermott International, Inc., 627 So.2d 702 (La.App. 4 Cir.1993) is also distinguishable. Although the demand for arbitration was not made until the case was eight years old, the Court found the plaintiff's lack of knowledge of its own arbitration clause was excusable and the demand for arbitration was made promptly after plaintiff became aware of its right. Equally important, the Court found defendant was responsible for plaintiffs lack of knowledge of the arbitration agreement by not timely responding to discovery and that defendant was not prejudiced in any way by being subjected to arbitration.
Bartley, Inc. v. Jefferson Parish School Board, 302 So.2d 280 (La.1974) is distinguished on the basis that it was a suit to compel arbitration. When the district court sustained exceptions of no cause of action to the petition seeking arbitration, the plaintiff timely sought review. It did not participate in any other litigation pending resolution of its request for arbitration. Likewise, in Moore v. Automotive Protection Corp., 97-0623 (La.App. 4 Cir. 5/21/97), 695 So.2d 550, as soon as the party entitled to it asked for and was denied arbitration, he sought review and obtained reversal of the trial court's decision *762 denying arbitration. He did not participate in protracted litigation while his arbitration claim remained in limbo.
Finally, in Lee v. Blackwell, 286 So.2d 185 (La.App. 4 Cir.1973), although the contract at issue provided that disputes were to be settled by arbitration, neither party requested arbitration and the case went to trial. The Court found that both parties had waived their right to arbitration.
Because we find, for the reasons stated above, that Desire waived its right to arbitration by not seeking timely review of the lower court's overruling of its exception of prematurity, it is unnecessary to consider Desire's contention that the trial court erred by presuming it was the proper forum to decide the waiver issue.

ASSIGNMENT OF ERROR NO. 3 - NONPECUNIARY DAMAGES:
The trial court found the Thomases were entitled to an award of $15,000.00 for nonpecuniary damages. In so finding it relied on the Third Circuit's decision in Sanders v. Zeagler, 95-1344 (La.App. 3 Cir. 3/6/96), 670 So.2d 748, for the proposition that "in order to recover nonpecuniary losses in connection with a breach of contract claim, a party must show that `the nature of the contract was to gratify a significant nonpecuniary interest by way of contract and that the obligor either knew or should have known that failure to perform would cause nonpecuniary loss to the obligee.'"
Defendant contends it was error for the Court below to rely on Sanders, supra, because while the case was decided in 1996, its facts arose before the 1985 amendment of the Civil Code which added article 1998.[2] We note that the Third Circuit's opinion in Sanders, supra was reversed by the Supreme Court in Sanders v. Zeagler, 96-1170 (La.1/14/97), 686 So.2d 819 for precisely the reasons stated by defendants in their brief.
However, we do not believe the Court below applied the incorrect law in this instance because the facts of this case arose after the effective date of article 1998. The law applied in the Third Circuit's Sanders decision was post-amendment law. It just could not be applied to pre-amendment facts. The issue thus becomes whether the contract for the building of the Thomases' house was a contract by its nature intended to gratify a nonpecuniary interest and whether Desire knew or should have known that its failure to perform would cause that kind of loss.
The trial court thought so. It based its award on the testimony of Mr. Thomas that he had grown up in the "projects" and his dream was to build his own home for himself and his family. The Court further noted that the defendants and the problems in the construction "created a lot of tension and emotional damages" between Mr. and Mrs. Thomas and their family. Finally, the Court noted the Thomases had been required to live in a house riddled with defects for almost a decade.
In 1977 this court found that a contract for the construction of a house was not one whose object was the gratification of some intellectual enjoyment. Relying on Meador v. Toyota of Jefferson, Inc., 332 So.2d 433 (La.1976), the Court held the homeowners were not entitled to damages for mental anguish from the contractor who breached the agreement. See, Catalanotto v. Hebert, 347 So.2d 301 (La.App. 4 Cir.1977). Meador, supra, had interpreted the predecessor of C.C. art.1998, art. 1934(3),[3] to allow recovery of nonpecuniary *763 damages where a principal or exclusive object of a contract is intellectual enjoyment.
The Supreme Court revisited this issue after the amendment of the Civil Code by art. 1998. In Young v. Ford Motor Co., 595 So.2d 1123 (La.1992), the Supreme Court held that article 1998 allows recovery of nonpecuniary damages where the obligee intends to gratify both pecuniary and nonpecuniary interests or where the interest is solely nonpecuniary. However, the court went on to hold that "the nature of the contract (including the facts and circumstances attending its formation) must demonstrate that gratification of the nonpecuniary interest constitutes a significant interest." Young, supra at 1124. No longer, then, must all nonpecuniary object be the principal or exclusive object of the contract. The obligee simply must want to satisfy a significant nonpecuniary interest.
Against this backdrop the Third Circuit decided Mayerhofer v. Three R's, Inc., 597 So.2d 151 (La.App. 3 Cir.1992), writ denied, 600 So.2d 680 (La.1992). The decision, written by Judge, now Justice, Knoll noted that traditionally nonpecuniary damages were not recoverable for the breach of a contract to build a home, Mayerhofer, supra at 154, but since the decision in Young, supra, such damages are no longer summarily disallowed.
In Mayerhofer, the plaintiff donated her used residence to a church. The pastor of the church was a real estate agent and an officer of Three R's, Inc., and as such he agreed to construct a house on her now vacant lot. After the house had been completed, plaintiff noted many defects. A punch list was prepared and the defects were substantially corrected by a carpenter. Upon moving in, plaintiff noted other defects such as loose doors, a split garage door, the kitchen cabinets did not fit properly against the wall, the upstairs bathroom leaked causing the floor upstairs to buckle and carpeting to fade, and certain brickwork was markedly uneven. The trial court awarded $10,000.00 in nonpecuniary damages for inconveniences and mental anguish. Then Judge Knoll wrote:
As we read the Supreme Court's pronouncement in Young, the standard to be applied in granting damages for nonpecuniary loss, is whether the nature of the contract was to gratify a significant nonpecuniary interest by way of contract and that the obligor either knew or should have known that the failure to perform would cause nonpecuniary loss to the obligee.
In determining whether the damages are pecuniary or nonpecuniary, we look to the nature of the contract.
In the case sub judice, the nature of the contract was to build a home. The record is void of any evidence that the nature of the contract would support a pecuniary interest of Mrs. Mayerhofer. Rather, the record evidence preponderates that the home was built for significant nonpecuniary interests of Mrs. Mayerhofer. She testified that this was to be the final home she would build and that the home would be something she could leave to her daughter who was sixteen years of age. She further stated that she wanted this home to be a place that her daughter could entertain friends and for it to be a house they could be proud of. The record clearly supports that the home was built for purely personal satisfaction and not for any pecuniary purpose.
The record evidence supports that Mrs. Mayerhofer suffered mental anguish and inconvenience because of defendants' breach of contract. The experts testified that the home as built by *764 Three R's and Sarver would not meet the minimum acceptable standards for residential construction. As pointed out by T.J. Gates, a consulting engineer who was accepted as an expert in residential construction, Mrs. Mayerhofer's home was one of the most substandard, newly constructed homes he had seen, and it exemplified the worst brickwork he had encountered.
Moreover, because Mrs. Mayerhofer underwent surgery shortly after the house was constructed and was significantly debilitated afterwards, she was forced to climb the stairs to the second floor because the ground floor bathroom was totally inoperable.
Accordingly, we find the trial court properly awarded nonpecuniary damages for defendants breaching the contract to build Mrs. Mayerhofer's home. Mayerhofer, 597 So.2d at 154-155.
In the Thomases' case the result should be no different. The nature of the contract was to build a home. To the Thomases this was the culmination of a life long dream to improve the quality of their lives, by rising from the housing projects to homeownership. It was to be the fulfillment of the American Dream for them. As in Mayerhofer, this was purely personal satisfaction. We find this to be a significant nonpecuniary interest within the meaning of Young, supra. Likewise, the defects in the Thomases' house were just as egregious as those in Ms. Mayerhofer's. The house could not pass a city inspection because of the improper spacing of ceiling joists and rafters and the plaintiffs are still in violation of the building code for which they could be subjected to fine and/or imprisonment. Also, we believe the record supports a finding that Desire knew or should have known that its failure to perform would cause such damages. Mr. Thomas testified that the Thomases and the Francoises were friends before the house construction started and insofar as the building of the house was concerned, Mrs. Francois was his "soulmate."
We find the trial court properly awarded nonpecuniary damages for the defendants' breach of the contract to build plaintiffs' house.

ASSIGNMENT NO. 4 - EXCESSIVE DAMAGES:
By this assignment Desire complains of the award of $30,000.00 for the repairs of the roof and the numerous defects in construction. It complains that the trial court did not consider change orders that altered the terms of the contract. Specifically Desire refers to the problem regarding the height of the bedroom ceiling. The plans called for it to be ten feet but it was built only to eight feet. It also claims that there is a valid change order regarding making the residence all electric instead of both gas and electric.
We find these complaints to be without merit. It is abundantly clear that the court accepted the testimony of Mr. Hotard concerning the defects in construction and the cost of rectify them. The court received into evidence Mr. Hotard's detailed report as Plaintiff's exhibit 51. His estimates for the specified repairs totaled between $25,050.00 and $30,000.00. It is no coincidence, then, that the trial court awarded $30,000.00 in damages. Significantly, though, a careful reading of Mr. Hotard's report, Plaintiff's exhibit 51, includes no estimate for eight foot as opposed to ten foot ceilings in the bedroom, and nether does it include any cost estimate relative to the plan deviation from partly gas to all electric. It is obvious the defendants were not cast for these problems.
Desire also complains that the court awarded damages because the original plans called for colored steel bathroom fixtures and white fiberglass fixtures were installed. A change order dated December 28, 1987 was placed in evidence as Defendant's exhibit 1. On page 3 of Plaintiff's exhibit 51 Mr. Hotard includes an estimate of $2,700.00 as a credit due the Thomases. He testified that the colored *765 steel fixtures called for in the plans, and upon which the Desire bid should have been based, were a premium cost item and that the replacement, white fiberglass, was the cheapest thing available. We conclude, as the trial court apparently did, that while the plans may have been changed by the change order, the plaintiffs were due a credit for the substitution of the items of lesser quality. There is no evidence that they received such a credit in the change order.
Next, Desire disputes the award for the improper spacing of ceiling joists and roof rafters stating that "the roof of the house had withstood New Orleans storms for nine years without incident." This is a specious argument. First, it is clear from Mr. Hotard's testimony that the joists and rafters do not comport with the architectural plans. The Thomases did not get what they paid for. See, Civil Code Article 2769, relied upon by the court below.
If an undertaker fails to do the work he has contracted to do, or if he does not execute it in the manner ... he has agreed to do it, he shall be liable in damages for the losses that may ensue from his non-compliance with his contract.
Secondly, the argument ignores the uncontradicted testimony of the two witnesses from the City's permit office that the roof and ceiling construction does not meet the requirements of the building code. It cannot be gainsaid that simply because the roof has not caved in that it will not cave in given the proper stress.
Finally, Desire contests the award of expert fees given for Mr. Hotard's service. Specifically, it is suggested that it should not have included the time Mr. Hotard spent in trial observing the trial.
An appellate court's review of expert witness fees is subject to the manifestly erroneous standard. The trial court should consider in determining these costs (1) the time spent testifying; (2) time spent preparing for trial; (3) time spent away from regular duties while waiting to testify; (4) the extent and nature of the work performed; and the knowledge, attainments and skill of the expert. See: Jeanpierre v. Mikaelian, 97-1850 (La.App. 4 Cir. 2/25/98), 709 So.2d 915, writ denied, 98-1162 (La.6/5/98), 720 So.2d 689 and cases cited therein.
We do not find the decision of the court below to be manifestly erroneous or an abuse of discretion. This was a long and protracted trial dealing with complex construction issues. Obviously, Mr. Hotard's testimony was of great assistance to the court, since it adopted all of his recommendations. Mr. Hotard indicated he had spent five or six hours out of court preparing for trial, including more than one visit to the house. At the on site visits it was necessary for him to get into the attic and conduct measurements of the joists and rafters. We do not find the trial court abused its wide discretion.

ATTORNEY FEES:
The trial court awarded plaintiffs attorney fees in the amount of $12,033.75 computed at an hourly rate of $125.00 per hour. It relied upon paragraphs 4.18 and 4.18.1 of the construction contract as its authority to make such an award. Defendants have not appealed the award of those fees and thus we are not called upon to determine if the award was appropriate. Plaintiffs have answered the appeal seeking an increase in the award of attorney fees for handling the appeal. Considering the briefs filed and the fact that the case has been argued twice we find an award of $1,000.00 in order.
The trial court's judgment is amended to include an award to plaintiffs of an additional $1,000.00 in attorney fees. In all other respects, the judgment is affirmed.
AMENDED, AND AS AMENDED, AFFIRMED.
ARMSTRONG, J., DISSENTS WITH REASONS.
*766 ARMSTRONG, J., dissenting.
I respectfully dissent because, under existing law, I do not believe that it can be said that the defendants waived the right to arbitrate. The plaintiffs' counsel wrote a letter to DCHC's counsel requesting arbitration. DCHC's counsel wrote back stating, among other things, that the request for arbitration was untimely. The plaintiffs then filed the present action. DCHC responded once again with an exception of prematurity based upon the arbitration clause in the contract and the fact that there still had not been any arbitration. The trial court overruled that exception of prematurity. The plaintiffs argue that DCHC had waived the right to arbitrate.
If a party seeks to arbitrate, and the other party fails or refuses to do so, then the party seeking arbitration can obtain a court order directing the other party to arbitrate. La. R.S. 9:4203. See also Musso's Corner, Inc. v. A + R Underwriters, Inc., 539 So.2d 915, 917 (La.App. 4th Cir. 1989). "Once the court finds an agreement to arbitrate and a failure to comply therewith, the court shall order arbitration." Matthews-Mc Cracken Rutland Corp. v. City of Plaquemine, 414 So.2d 756, 757 (La.1982) (emphasis in original). Therefore, even if the letter from DCHC's counsel to the plaintiffs' counsel is interpreted as a refusal to arbitrate, the plaintiffs had a clear statutory remedy to compel arbitration.[1] Moreover, the issue of whether the plaintiffs had lost their arbitration rights by delay (as alleged by DCHC) is one to be decided in the first instance by the arbitrator. The relevant clauses of the contract provide as follows:
2.2.9 Claims, disputes and other matters in question between the contractor and the owner relating to the execution or progress of the Work or the interpretation of Contract Documents shall be referred initially to the Architect for decision which he will render in writing within a reasonable time.
* * *
2.2.12 Any claim, dispute or other matter in question between the Contractor and the Owner referred to the Architect, except those relating to artistic effect as provided in Subparagraph 2.2.11 and except those which have been waived by the making or acceptance of final payment as provided in Subparagraphs 9.9.4 and 9.9.5, shall be subject to arbitration upon the written demand of either party. However, no demand for arbitration of any such claim, dispute or other matter may be made until the earlier of (1) the date on which the Architect has rendered a written decision, or (2) the tenth day after the parties have presented their evidence to the Architect or have been given a reasonable opportunity to do so, if the Architect has not rendered his written decision by that date. When such a written decision of the Architect states (1) that the decision is final but subject to appeal, and (2) that any demand for arbitration of a claim, dispute or other matter covered by such decision must be made within thirty days after the date on which the party making the demand receives the written decision, failure to demand arbitration within said thirty days' period will result in the Architect's decision becoming final and binding upon the Owner and the Contractor. If the Architect renders a decision after arbitration proceedings have been initiated, such decision may be entered, as evidence but will not supersede any arbitration proceedings unless the decision is acceptable to all parties concerned.

*767 * * *
7.4.1 Should either party to the Contract suffer injury or damage to person or property because of any act or omission of the other party or of any of his employees, agents or others for whose acts he is legally liable, claim shall be made in writing to such other party within a reasonable time after the first observance of such injury or damage.
7.9.1 All claims, disputes and other matters in question between the Contractor and the Owner arising out of, or relating to, the Contract Documents or the breach thereof, except as provided in Subparagraph 2.2.11 with the respect to the Architect's decisions on matters relating to artistic effect, and except for claims which have been waived by the making or acceptance of final payment as provided by Subparagraphs 9.9.4 and 9.9.5, shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association then obtaining unless the parties mutually agree otherwise. No arbitration arising out of or relating to the Contract Documents shall include, by consolidation, joinder or in any other manner, the Architect, his employees or consultants except by written consent containing a specific reference to the Owner-Contractor Agreement and signed by the Architect, the Owner, the Contractor and any other person sought to be joined. No arbitration shall include by consolidation, joinder or in any other manner, parties other than the Owner, the Contractor and any other persons substantially involved in a common question of fact or law, whose presence is required if complete relief is to be accorded in the arbitration. No person other than the Owner or Contractor shall be included as an original third party or additional third party to an arbitration whose interest or responsibility is insubstantial. Any consent to arbitration involving an additional person or persons shall not constitute consent to arbitration of any dispute not described therein or with any person not named or described therein. The foregoing agreement to arbitrate and any other agreement to arbitrate with an additional person or persons duly consented to by the parties to the Owner-Contractor Agreement shall be specifically enforceable under the prevailing arbitration law. The award rendered by the arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.
7.9.2 Notice of the demand for arbitration shall be filed in writing with the other party to the Owner-Contractor Agreement and with the American Arbitration Association, and a copy shall be filed with the Architect. The demand for arbitration shall be made within the time limits specified in Subparagraph 2.2.12 where applicable, and in all other cases within a reasonable time after the claim, dispute or other matter in question has arisen, and in no event shall it be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statute of limitations.
An arbitration clause and issues analogous to those of the present case were considered in Conagra Poultry Co. v. Collingsworth, 30,155 (La.App. 2 Cir. 1/21/98), 705 So.2d 1280, 1282-83. In that case, the Court of Appeal held that the question of whether the party seeking arbitration had waited too late to do so was to be decided by the arbitrator rather than the court. See also Bartley, Inc. v. Jefferson Parish School Board, 302 So.2d 280 (La.1974) (claim that demand for arbitration was premature because claim had not first been referred to architect must be decided by arbitrator, not court); Charles Ragusa & Son, Inc. v. St. John the Baptist Parish School Board, 629 So.2d 1302, 1304 (La. App. 4th Cir.1993) (questions of "procedural *768 arbitrability" must be decided by arbitrator rather than court).
Additionally, the issue of whether DCHC waived its right to arbitrate is also an issue to be determined by the arbitrator rather than by the court. Bartley, 302 So.2d 280. Furthermore, in those instances when the courts have addressed the issue of waiver of arbitration, they have emphasized that "[t]here is a strong presumption in favor of arbitration and against finding a waiver or default." Moore v. Automotive Protection Corp., 97-0623 (La.App. 4 Cir. 5/21/97), 695 So.2d 550, 551. Accord Rauscher Pierce Refsnes, Inc., 93-1672 (La.App. 4th Cir 2/11/94), 632 So.2d 807-810. "Because of the strong policy favoring arbitration, a party's otherwise explainable conduct should be construed against waiver of the right, and courts have found waiver only in extreme cases." Electrical + Instrumentation Unlimited, Inc., v. Mc. Dermott International, Inc. 627 So.2d 702, 703 (La. App. 4th Cir.1993). Accord Matthews-McCracken Rutland Corp. v. City of Plaquemine, 414 So.2d 756 (La.1982). In the present case, the DCHC conduct at issue (the letter of counsel asserting that the request for arbitration is untimely) could be explainable as an attempt to point out to the plaintiffs alleged weakness in the merits of the plaintiffs' position rather than as a waiver of arbitration in favor of court proceedings. In fact, nothing in the letter at issue suggests that DCHC refused to waive arbitration in favor of court proceedings. Rather the letter suggests that, if the plaintiffs proceed, they will lose. Thus, the letter by DCHC's counsel did not constitute a waiver of arbitration.
The plaintiffs argue that because DCHC did not immediately appeal the trial court's decision overruling DCHC's exception of prematurity, nor take writs from that decision, DCHC cannot now challenge on appeal the trial court's overruling of the exception. This argument is precluded by the Supreme Court's decision in Collins v. The Prudential Ins. Co. of America, 99-1423 (La.1/19/00) 752 So.2d 825, and by the consideration that we should not create procedural traps by which parties, despite following the provisions of the Code of Civil Procedure and the usual requirements for preserving in the trial court record issues for subsequent appeal, lose the important right of appellate review.
Collins does differ from the present case in that, in Collins, the trial court ordered arbitration, whereas, in the present case, the trial court denied arbitration. However, the reasoning of the Collins' decision and, thus, presumably, its rule, is applicable to situations involving trial court denials of arbitration.
The Collins' Court first noted that appeals may be taken only from final judgments and from those interlocutory judgments which cause irreparable injury. It then held that a judgment ordering arbitration is not final but is, instead, interlocutory because: "A judgment that does not determine the merits but only preliminary matters is an interlocutory judgment." Under that standard, the judgment below denying arbitration by overruling the exception of prematurity is clearly interlocutory.
The Collins' Court also held that a trial court's judgment ordering arbitration (instead of trial) does not cause irreparable injury so as to make it appealable despite its interlocutory nature. In so holding, the court stated: "Generally, requiring a party to go to trial does not constitute irreparable injury turning an otherwise interlocutory order into an appealable one." The judgment below, by denying arbitration, ordered DCHC to go to trial. Under the just-quoted passage from Collins, that did not constitute irreparable injury so as to allow an appeal by DCHC.
Lastly, the Collins' court held that lack of an immediate appeal does not mean that there will never be available immediate relief from the courts of appeal because, in particular cases, review by supervisory writs might be appropriate. But, at least *769 in the context of trial court judgments ordering arbitration, the Collins' Court admonished that supervisory jurisdiction should be exercised "only sparingly". Justice Lemmon, concurring, noted that, when an issue is resolved upon an appeal from a final judgment, rather than on supervisory writs prior to trial, it may turn out that the time and expense of the trial was wasted. However, he noted the waste of time and expense of the trial "is a risk of litigation that must yield to the normal orderly process of trial and appeal". In the present case, the plaintiff insisted upon proceeding to trial, rather than arbitration (because in the trial court, they argued that arbitration had been waived). It certainly has not heretofore been the understanding that, when an exception is overruled by the trial court, the defendant must apply for supervisory writs or be barred from raising on an appeal from a final judgment the issue that was the subject of the exception. There is nothing in the plaintiffs' argument (that DCHC waived arbitration by failing to apply for supervisory writs with respect to the overruling of its exception of prematurity) that is limited to a prematurity exception or to arbitration. Moreover, it is and has been the general understanding that, if an issue such as prematurity, personal jurisdiction, res judicata, prescription or venue is raised by the filing of the appropriate exception, then, even if the trial court overrules that exception, the issue has been properly raised in the trial court and preserved for ultimate appellate review on an appeal from a final judgment. Resort to an application for supervisory writs is not compulsory and is not necessary in order to preserve an issue for appeal from a final judgment.[2]
The plaintiffs also argue that DCHC waived its right to arbitrate by "voluntarily" participating in the litigation including pleadings, discovery and trial. I disagree. DCHC is the defendant and its exception of prematurity by which it sought arbitration was overruled. (DCHC's dilatory exception of prematurity was the proper procedure to raise the arbitration issue. Moore v. Automotive Protection Corp., 97-0623 (La.5/21/97), 695 So.2d 550, 551). It would have been unwisely bold for DCHC not to defend itself in the litigation after its exception of prematurity was overruled. Thus, DCHC's participation in the litigation was not "voluntary."
For the foregoing reasons, I would vacate the judgment of the trial court and remand with instructions that the trial court order the parties to arbitration and stay proceedings in court pending the completion of the arbitration.
*770
 APPENDIX A
 JAMES A. GRAY, II Tel: (504) 561-5831
 ATTORNEY-AT-LAW
 A PROFESSIONAL LAW CORPORATION
 Suite 2304
 1001 Howard Ave.
 New Orleans, LA 70113
 June 11, 1990
Mr. Edward J. Rivera
Attorney at Law
925 Common St., 11th Floor
New Orleans, Louisiana 70112
 RE: Hendrick Thomas, et al v. Desire
 Community Housing Corp., et al
Dear Mr. Rivera:
I think we still have a dispute about which AIA Document A201
applies. That probably doesn't matter, however, since I believe
that your claim has prescribed under both.
My client wants to sue your client for malicious prosecution. I
will urge them to drop it if you will drop your suit. But if you
insist, we will go all the way to judgment if pushed.
You have the following problems:
 a. The suit came after prescription
 b. You have to complain to the architect within a reasonable
 time or within 21 days depending on the A201 that
 applies. Your client did neither.
 c. Your request for arbitration comes too late. It would
 have been late if made on the day you filed suit. But
 I know of no authority that says erroneously filing suit
 stops the running of time to ask for arbitration. I
 think that you especially have a problem considering the
 delay even after you were put on notice about
 arbitration.
 d. Your client does not have a contract with Mrs. Francois.
 I am not agreeing to engage in arbitration or anything
 
*771
Mr. Edward Rivera
Page -2-
June 11, 1990
 else with you about her personally. After you dismiss
 her with prejudice, I will move forward.
Please give me your thoughts on these issues.
 Sincerely,
 
 James A. Gray, II
 Bar No. 6262
JAGII:gj
cc: Mrs. Delories P. Francois
NOTES
[1] The dissent's reliance on Collins v. The Prudential Ins. Co. of America, 99-1423 (La.1/19/00) 752 So.2d 825, for the proposition that a trial court ruling as to arbitrability is not a final appealable judgment nor an interlocutory judgment causing irreparable injury, is misplaced. In Collins the court found that an order compelling arbitration was not a final appealable judgment nor an interlocutory judgment causing irreparable harm. It reasoned that if the referral to arbitration was improper, that ruling could be corrected by the district court on a motion to vacate the award or on a contest of the motion to confirm the award. Ultimately the district court's decision is subject to review on appeal.

However, in this case, we deal with an order that refused to order arbitration. As noted by the Supreme Court under section 16 of The Federal Arbitration Act such a ruling would be appealable. See 99-1423 at 4; 752 So.2d at 828. That is the same result reached by this court in Rauscher Pierce Refsnes, Inc. v. Flatt, supra., which more closely resembles the facts of this case.
[2] Damages for nonpecuniary loss may be recovered when the contract, because of its nature, is intended to gratify a nonpecuniary interest and, because of the circumstances surrounding the formation or the nonperformance of the contract, the obligor knew, or should have known, that his failure to perform would cause that kind of loss.
[3] Although the general rule is, that damages are the amount of the loss the creditor has sustained, or of the gain of which he has been deprived, yet there are cases in which damages may be assessed without calculating altogether on the pecuniary loss, or the privation of pecuniary gain to the party. Where the contract has for its object the gratification of some intellectual enjoyment, whether in religion, morality or taste, or some convenience or other legal gratification, although these are not appreciated in money by the parties, yet damages are due for their breach; a contract for a religious or charitable foundation, a promise of marriage, or an engagement for a work of some of the fine arts, are objects and examples of this rule.
[1] A copy of the letter from DCHC's counsel to plaintiffs' counsel is attached as Appendix "A".
[2] Unlike Collins, which was governed by the Federal Arbitration Act the present case, not apparently involving interstate commerce, appears to be governed solely by Louisiana State law. Thus, the appellate procedural provisions of the Federal Arbitration Act have no application to this case.