824 So.2d 383 (2002)
Randall BEASLEY, Sr.
v.
ED'S MOBILE HOMES, INC., et al.
No. 01-1549.
Court of Appeal of Louisiana, Third Circuit.
April 17, 2002.
Writ Denied September 20, 2002.
Angelo J. Piazza, III, Marksville, LA, for Plaintiff/Appellee, Randall Beasley, Sr.
Robert G. Nida, June Wells-Foster, Gold, Weems, Bruser, Sues & Rundell, Alexandria, LA, for Defendant/Appellant, Cavalier Manufacturing, Inc., d/b/a Riverchase Homes.
Aaron Siebeneicher, Alexandria, LA, for Defendant/Appellant, Ed's Mobile Homes, Inc.
Court composed of NED E. DOUCET, JR., ULYSSES GENE THIBODEAUX, and MICHAEL G. SULLIVAN, Judges.
THIBODEAUX, Judge.
In this redhibition action, defendant, Cavalier Manufacturing, Inc., d/b/a Riverchase *384 Homes, appeals a judgment in favor of the purchaser, Randall Beasley, Sr. For the following reasons, we affirm.

I.

FACTS
On May 22, 1998, Beasley purchased a double-wide mobile home from Ed's Mobile Home, Inc. (Ed's). The home was manufactured by Riverchase. The total price of the mobile home, including interest, was $170,971.20. Beasley planned to live in the home as well as operate a business. Beasley testified that there were several defects on the home at the time of purchase. With respect to those defects, Beasley testified that he was told by salesman, Bobbie Sullivan, that the exterior of the home was a temporary wall, and that inside the home there were "several broken panels, holes in the panel ... the bathroom door leaned." Beasley further testified that he was told that the problems with the mobile home were minor and could be easily remedied within three days and prior to delivery.
The mobile home was delivered to Beasley on June 9, 1998. The defects in the mobile home were not repaired. Beasley testified that he did not move into the home because the "carpet hadn't even been stretched on the floor." He also testified that the bathroom door was laying on the floor, there were broken boards, a broken window, and some of the wall paneling had holes and glue on them. Beasley continued to testify that "the fireplace was brokencracked from one end to the other all the way across the wall." Beasley testified that the cabinet doors and drawers were not aligned. He further testified that debris lay everywhere and molding had not been installed. Beasley also testified that he reported the mobile home's problems to Ed Thompson at Ed's on the date the mobile home was installed, and wrote a letter dated June 28, 1998, to Ed's listing the defects with the mobile home.
Ricky Thurman, a repairman sent by Ed's to examine the mobile home at the site, was given a list of the mobile home's problems; however, the repairs to the mobile home were never made. Thurman did not attempt to repair any portion of the mobile home because he was not told the extent of the problems with the mobile home, and arrived with inadequate materials to fix the many problems. Beasley testified that the problems with the mobile home were so numerous that he could not live there. In connection with Beasley's testimony, fifty-three pictures of the mobile home and its defects as well as a listing of the defects was admitted into evidence.
By November 18, 1998, repairs to the mobile home had not been done. Riverchase authorized Dale Hester to submit an estimate of the cost to repair the mobile home. Hester estimated that it would cost $5,140 to repair the home. Beasley testified that Riverchase did not approve the repairs because the cost was over $5,000. Beasley further testified that he offered to pay the difference of $140 if it would mean the mobile home would be repaired. Riverchase refused to approve the repair work. Beasley also testified that had he known of all of the mobile home's defects and that the defendants would not repair any of the defects, he would not have bought the mobile home. Beasley testified that he gave the defendants six months to complete the repairs, and that even after the six months if the defendants said they would make the repairs so that he could move in, he would have allowed them to do so.
During the time that Beasley could not live in the mobile home purchased from *385 Ed's, he lived with his neighbor and paid $300 a month for rent for thirty-six months for a total of $10,800. Beasley did not pay the monthly notes of approximately $474 due for the purchase of the mobile home, and it was ultimately removed from his property by the creditor. Prior to the seizure, Beasley testified that he requested Ed's to take the mobile home back; but Ed's told him that they could not take it back. Beasley was able to pay his rent from the income he earned from his business as a "crane" arcade game owner and a newspaper carrier. The only payment he made toward the purchase of the mobile home was $4,200 on the day he closed the deal on the sale of the home.
Beasley testified that because the mobile home was uninhabitable, he was inconvenienced in running his business. On the days that repairmen came to look at the home and attempted to make repairs he had to be present, causing him to miss doing his paper route about a dozen times and making it necessary for him to pay someone else to run the route. He further testified that he suffered sleepless nights. Beasley testified as follows with respect to how the whole situation made him feel:
To use the word devastation, sick nauseated. I can'titlet me try it this way. I wanted to go out and buy something new. I didn't want something used. Like maybe a used car you buy somebody's headache. I wanted something new. Something that I could be proud of. Something that I could live in. You need to go out and do that. You go out and do it and you pass by that house every day for six months and you look at it, the house you can't live in. You put up with the frustration and the aggravation that I put up with with these people trying to get them to fix this thing. You look at it every day and then you come back in here and you want to ask me that question? You'll know before you do it, go by the drugstore and get you some sleeping pills. You're going to need it, three or four times a week. Get you something for your stomach, too, because you might throw up a time or two. You put up with it.
Beasley further testified that he had to hire an attorney and pay a $2,000 retainer fee.
On cross examination, Beasley testified that his income in 1997 was $59,910. This was the income amount he provided in connection with obtaining a loan to purchase the mobile home. Beasley testified that although he could have paid the monthly mortgage note on the mobile home, he refused to pay for something in which he could not live. Beasley further testified that he felt it was unsafe to live in the mobile home because he could not "start a fire in the fireplace, possible hidden damage in the walls, electrical problems, shifting of the back of the house, insufficient tie downs [and] improper blocking." Beasley explained that improper blocking meant that it was possible, in heavy winds, for the mobile home to be blown over. Beasley further testified that although he never moved into the mobile home, he did have the sewerage, electricity and water connected and stored some of his belongings there. In addition to feeling that the mobile home was unsafe, Beasley testified that he did not move into the home because he did not want to be blamed for causing any of the defects. While the home was unoccupied, it was burglarized at least one time and some of Beasley's property was stolen.
Beasley also testified that he visited between eight and ten mobile home lots before choosing the mobile home at Ed's. He also testified that he told the Ed's salesperson, Bobbie Sullivan, that he was looking for a double-wide mobile home in which to live. Beasley further testified *386 that he discussed problems with the mobile home with Sullivan. When he viewed the inside and saw that the "marriage lines" were not aligned, he was not concerned because he understood that a double-wide mobile home came in two parts. He assumed that once on his lot, the two sides would be put together properly.
On December 8, 1998, Beasley filed a "Petition in Redhibition." A bench trial in the matter was held on June 27, 2001. At the end of trial, the trial judge rendered a judgment in favor of Beasley and against defendants. The trial judge awarded Beasley $30,000 in general damages, $4,200 for the return of the down payment Beasley made on the mobile home, $10,800 in special damages for rental payments Beasley made during the time he could not live in the mobile home, and $5,000 in attorney fees. Further, the trial court apportioned the defendant's fault, finding Riverchase liable for ninety percent of Beasley's damages and Ed's liable for the remaining ten percent of the damages. It is from this ruling that Riverchase appeals, assigning as error the trial court's award of rental expenses and its award of general damages. Ed's did not appeal; therefore, this court will not address the trial court's apportionment of fault to Ed's.

II.

ISSUES
1. Has Beasley met his burden of proof establishing his entitlement to rental expense damages? and,
2. Has Beasley satisfied the requirements for an award of general damages in this redhibition case?

III.

LAW AND DISCUSSION

Rental Expense Damages:
Riverchase argues that because Beasley failed to produce receipts for the amount of rent he paid during the time he did not live in his home, he did not sufficiently prove his entitlement to damages for rental expense. We disagree. The evidence in the record shows and Riverchase does not dispute that Beasley did not live in the mobile home. Riverchase does not even dispute the existence of the many defects to the mobile home. Beasley testified, and the trial judge apparently believed, that he paid rent to live somewhere other than his mobile home. Riverchase is correct that the rental receipts would constitute the best evidence of the amount Beasley paid in rent because he could not move into his mobile home. Mut v. Newark Ins. Co., 289 So.2d 237 (La.App. 1 Cir.1973). However, "[i]n evaluating evidence, the trier of fact should accept as true the uncontradicted testimony of a plaintiff witness, absent a sound reason for its rejection." Johnson v. Insurance Co. of North America, 454 So.2d 1113, 1117 (La.1984). Even where the witness testifying is a party, where the record indicates no sound reason for its rejection, the trier of fact should accept as true the uncontradicted testimony of that witness. Robertson v. Scanio Produce & Institutional Foods, Inc., 449 So.2d 459 (La.1984). We find that there were no circumstances casting doubt on the reliability of Beasley's testimony that he spent $10,800 for rent during the year he was unable to live in his home. Thus, we find no error in the trial court's finding that Beasley proved this item of damages.

General Damages:
Riverchase asserts that Beasley should not have been awarded general damages in this redhibition case. As noted above, there is no question but that the mobile home purchased by Beasley was defective. In determining liability for such damages, we look to La.Civ.Code art. 2545:

*387 A seller who knows that the thing he sells has a defect but omits to declare it, or a seller who declares that the thing has a quality that he knows it does not have, is liable to the buyer for the return of the price with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale and those incurred for the preservation of the thing, and also for damages and reasonable attorney fees. If the use made of the thing, or the fruits it might have yielded, were of some value to the buyer, such a seller may be allowed credit for such use or fruits.
A seller is deemed to know that the thing he sells has a redhibitory defect when he is a manufacturer of that thing.
A manufacturer is conclusively presumed to have knowledge of defects in the object it produces. Young, 595 So.2d 1123 (La. 1992). Thus, because of this presumption, Riverchase is deemed to be in bad faith in selling a defective product. Further, the supreme court has held in Young v. Ford Motor Co., Inc., 595 So.2d 1123 that when the requirements of La.Civ.Code arts. 2545 and 1998 are met, purchasers can recover mental anguish damages caused by the purchase of the defective product even though the product is not unreasonably dangerous and they have not sustained physical injuries. Louisiana Civil Code Article 1998 provides:
Damages for nonpecuniary loss may be recovered when the contract, because of its nature, is intended to gratify a nonpecuniary interest and, because of the circumstances surrounding the formation or the nonperformance of the contract, the obligor knew, or should have known, that his failure to perform would cause that kind of loss.
Regardless of the nature of the contract, these damages may be recovered also when the obligor intended, through his failure, to aggrieve the feelings of the obligee.
In Young, the supreme court found that, although a contract to purchase a car was primarily pecuniary in nature, there are circumstances where the purchase of a car may be made for nonpecuniary reasons relating to taste, enjoyment, and personal preferences of owning and driving a chosen vehicle. The difference between a pecuniary and nonpecuniary car purchase contract was illustrated by the supreme court as the difference between buying a new car from a car dealership lot and buying an antique or a specially-designed, custom built vehicle, the latter contract being primarily nonpecuniary in nature. In McGough v. Oakwood Mobile Homes, Inc., 34,091, p. 16 (La.App. 2 Cir. 11/1/00); 779 So.2d 793, 804 the court noted that "the purchase of a mobile home is primarily pecuniary in nature;" but, further noted that "[d]espite that finding ... if the record supports the gratification of a significant nonpecuniary interest in ... [the] purchase of the mobile home ... [the purchaser] may be entitled to nonpecuniary damages." The trial court in McGough simply found that the McGoughs purchased the home to serve as their family residence, and therefore concluded that the McGoughs had a "significant nonpecuniary objective." Id. The appellate court disagreed and stated
While we do not question the aggravation and inconvenience occasioned by the problems and attempted repair of this defective mobile home, we do not believe that the evidence satisfies the requirement from Young that the purchase was made to satisfy a significant nonpecuniary interest.... The only evidence regarding Mrs. McGough's motivation in purchasing the mobile home is that she needed a place for her family to reside. *388 At the time of the purchase, she and Mr. McGough were living in an office and her children were living with her sister.
Id. The appellate court concluded "that Mrs. McGough failed to make the requisite showing of gratification of a significant nonpecuniary interest under ... Young." Id.
In Thomas v. Desire Community Housing Corp., 98-2097 (La.App. 4 Cir. 8/10/00); 773 So.2d 755, a case involving the defective construction of a home, the court found that the nature of the contract to build the Thomas' home supported a nonpecuniary interest. The court found that "[t]o the Thomases this was the culmination of a life long dream to improve the quality of their lives, by rising from the housing projects to homeownership." Id. at 764. The court further stated that the construction of their home was "to be the fulfillment of the American Dream for them." Id. The court ultimately concluded that the nature of the contract to build their home was significantly nonpecuniary. Likewise, in Taylor v. Burton, 97-1348 (La.App. 3 Cir. 3/6/98); 708 So.2d 531 another case involving defective construction of a house, this court found that the homeowners proved that the contract to build their house was intended to gratify a significant nonpecuniary interest. This court based its conclusion on the following:
Both Ken and Penny Taylor testified that this was the first house the couple had built. They stated that the house in which they had been living was cramped, and they had been looking forward to entertaining family and friends in their new house. They further stated that their children were also looking forward to having get-togethers at the new house with their friends. The Taylors also testified that because of the obvious defects they were embarrassed to have friends over. Penny Taylor stated that the day the garage ceiling sagged, a scheduled family function had to be canceled because they were afraid of possible danger to family members.
Id. at 533.
Similarly, in Mayerhofer v. Three R's, Inc., 597 So.2d 151, 155 (La.App. 3 Cir.), writ denied, 600 So.2d 680 (La.1992), this court found the record supported the conclusion that the Mayerhofer home "was built for purely personal satisfaction and not for any pecuniary purpose" where the plaintiff testified as follows:
[T]his was to be the final home she would build and that the home would be something she could leave to her daughter who was sixteen years of age. She further stated that she wanted this home to be a place that her daughter could entertain friends and for it to be a house they could be proud of.
Like the court in McGough, we do not question the aggravation and inconvenience Beasley suffered by the problems and the failure to repair his defective mobile home; however, we do not believe that the evidence satisfies the Young requirement that the contract was entered into to satisfy a significant nonpecuniary interest. The nature of Beasley's contract to purchase the mobile home does not make it evident that it is of a nonpecuniary nature. Further, the facts and circumstances surrounding the purchase demonstrate that Beasley purchased the mobile home for a significant pecuniary purposea place in which to live and operate his business.
However, La.Civ.Code art. 1998, which addresses the applicability of nonpecuniary loss, provides an express exception to the requirement of a nonpecuniary purpose of the contract "when the obligor intended, through his failure, to aggrieve the feelings of the obligee." It appears from the record that Riverchase, the manufacturer imputed with bad faith for the defective *389 mobile home, engaged in intentional bad faith, and thus its bad faith is not merely imputed due to its position as manufacturer of a mobile home. In Ducote v. Perry's Auto World, Inc., 98-1972 (La.App. 1 Cir. 11/5/99); 745 So.2d 229, the first circuit found that although the purchase of a used automobile was primarily of a pecuniary natureto provide transportation-due to the seller's intentional bad faith in failing to inform the purchaser of a known defect of the carburetor in addition to failing to repair the vehicle, the exception of La.Civ. Code art. 1998 was applicable. Therefore, the plaintiff in Ducote was entitled to nonpecuniary damages even though the vehicle purchase contract was of a pecuniary nature.
Likewise, we find that regardless of the nature of Beasley's contract to purchase his mobile home, due to the actions of Riverchase in failing to make the proper repairs to Beasley's mobile home, and in failing to approve repair of the home for a bid in an amount over $5,000 when Beasley offered to pay the difference of $141 with knowledge that the mobile home was uninhabitable in its defective condition, constitutes intentional bad faith on the part of Riverchase. Applying the above precepts to the matter before us, we find that the trial court was correct in its award of general damages. Moreover, the court did not abuse its discretion in its award of general damages in the amount of $30,000. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
The judgment of the trial court is affirmed. Costs of this appeal are assessed to defendant-appellant, Riverchase.
AFFIRMED.