SHELLEY W. WEST

VERSUS

BRUNER HEALTH GROUP, INC., ET AL.


**********

APPEAL FROM THE
TENTH JUDICIAL DISTRICT COURT,
PARISH OF NATCHITOCHES, NO. 72091, DIV. B
HONORABLE MONTY L. DOGGETT, DISTRICT JUDGE

**********

JIMMIE C. PETERS
JUDGE

**********

Court composed of Chief Judge Ned E. Doucet, Jr., Billie Colombaro Woodard and
Jimmie C. Peters, Judges.

**AFFIRMED AS AMENDED.**

Woodard, J., dissents in part and assigns written reasons.

**Billy R. Pesnell**
**Hargrove, Pesnell & Wyatt**
**P. O. Box 59**
**Shreveport, LA 71161**
**(318) 429-7200**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **Shelley W. West**

**James C. McMichael, Jr.**
**McMichael, Medlin & D'anna, L.L.C.**
**P. O. Box 72**
**Shreveport, LA 71161-0072**
**(318) 221-1004**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
    **Bruner Health Group, Inc.**
    **Justin Bruner**

**Jennifer Bruner**

**Rebecca L. Castillo**
**Cook, Yancey, King & Galloway**
**P. O. Box 22260**
**Shreveport, LA  71120-2260**
**(318) 221-6277**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Corporate Resource Management, Inc.**

PETERS, J.

Shelley W. West brought this action against Bruner Health Group, Inc. (Bruner Health), Corporate Resource Management, Inc. (CRM), Justin Bruner, and Jennifer Bruner to recover damages arising from her employment relationship with the defendants. The trial court rendered judgment in favor of Mrs. West and against the defendants in varying amounts. All of the defendants have appealed.

## DISCUSSION OF THE RECORD

### *Factual Background*

Bruner Health is an Oklahoma corporation that sells medical equipment and supplies to individuals and institutional healthcare providers. Justin and Jennifer Bruner (collectively, the Bruners) are the principal shareholders[1] and officers of Bruner Health and other interwoven corporations. Mrs. West, a Natchitoches Parish resident, responded to a 1997 internet recruitment advertisement posted by J.A.B. & Company (J.A.B.), a predecessor company to Bruner Health. The advertisement sought individuals to act as sales agents for J.A.B. Mrs. West traveled to Oklahoma, attended J.A.B. training classes and qualified as a J.A.B. sales agent. While in Oklahoma, she met the Bruners. On December 1, 1997, J.A.B. retained Mrs. West as its sales agent, which was memorialized in a written agreement which set her compensation at forty percent of "profits from collected sales." Jennifer Bruner signed the agreement on behalf of J.A.B.

Sometime in 1998, J.A.B. changed its name to MedAssist, Inc. (MedAssist). Mrs. West then entered into a written employment contract with MedAssist. This contract, which was consummated in October of 1998,[2] changed her status with the corporation from that of "agent" to "employee"; designated Mrs. West as MedAssist's

---

[1]The record contains no evidence of the exact ownership interest shared by the Bruners, although it is clear they are the principal owners.

[2]The space for the insertion of a date on the contract was left blank except for the year (1998). Mrs. West testified that her employment with MedAssist began in October of 1998.

area manager (defining the area as the State of Louisiana); set her monthly salary at $3,750.00; provided for a maximum $300.00 reimbursement of monthly out-of-pocket expenses; provided for private automobile milage reimbursement at twenty-five cents per mile; and provided for payment of a five percent commission on the "total allowable sales revenue" generated from the Natchitoches, Louisiana office and a two percent commission on the "total allowable sales revenue" generated from the Baton Rouge, Louisiana office. Jennifer Bruner executed the contract in her capacity as president of MedAssist.

MedAssist then changed its name to Bruner Health Group, Inc. While the record does not establish the specific date of this change, correspondence to sales representatives from Jennifer Bruner dated November 25, 1998, informed the representatives that, effective January 1, 1999, they were to cease using any forms or cards bearing the MedAssist name. However, even before January 1, 1999, the corporation's relationship with its employees, including Mrs. West, changed again.

This change came about in December of 1998 when Bruner Health entered into a written "LEASED PERSONNEL AGREEMENT" with CRM. Under this agreement, CRM became the employer of all of Bruner Health's employees. CRM then immediately "leased" the employees back to Bruner Health. To effect this agreement, CRM provided each Bruner Health employee with its own "Employee Packet" containing a CRM employment application form, tax withholding forms, and CRM's written policy regarding certain employee-employer relationships. Mrs. West completed the appropriate forms found in the packet and returned them to CRM. Although she executed the documents on December 21, 1998, other CRM records indicate that CRM became her employer effective October 1, 1998.

CRM describes itself as a "professional employer organization" which performs

2

"human resource services" for various companies. It did little more than perform payroll production services for Bruner Health, although the agreement imposes numerous other obligations on CRM. Basically, Bruner Health supplied CRM with the appropriate employee records, reflecting compensation earned and expenses to be reimbursed, and deposited the appropriate amount in a CRM account to effect payment. CRM then calculated the amount to be paid an employee in any given pay period and forwarded the payroll check to Bruner Health. Bruner Health disbursed the CRM check directly to the appropriate employee. After Mrs. West began receiving her payroll checks drawn on a CRM account, she still addressed any questions concerning her compensation to Bruner Health.

On or about June 2, 1999, Justin Bruner notified CRM that Mrs. West had resigned her employment effective that date. Based on this information, CRM ceased issuing checks to Mrs. West. Between June 2, 1999, and November 23, 1999, Mrs. West complained regularly to the Bruners that her compensation had been stopped. The Bruners assured her that she would be fully compensated and instructed her not to contact CRM. They even partially compensated her with payments totaling $12,840.71. However, these payments came, not from CRM or Bruner Health, but from two other companies apparently controlled by the Bruners—Legacy Home Medical, Inc. and Life Link.

Mrs. West finally lost faith in the Bruners' promises and, by letter dated November 23, 1999, informed Bruner Health, the Bruners, and CRM that she resigned her employment effective 5:00 p.m. on that date. In the letter, she also made demand on all parties for her unpaid salary, commissions, and expenses. When this demand was not satisfied, she filed the instant suit.

*Procedural History*

3

Mrs. West filed her initial suit on February 3, 2000, asserting that Bruner Health and CRM owed her unpaid salary, commissions, and reimbursable expenses related to her employment. Additionally, she sought an award of statutory penalties and attorney fees. Bruner Health initially responded by filing a declinatory exception of lack of subject matter jurisdiction and a dilatory exception of prematurity. Bruner Health based these exceptions on an arbitration clause found in the 1998 MedAssist employment contract. However, Bruner Health did not seek an order to stay the proceedings pending disposition of the exceptions.

On April 3, 2000, and after Bruner Health filed its exceptions, Mrs. West propounded written interrogatories and requests for production of documents to both defendants. Three days later, she amended her petition to name the Bruners as additional defendants, asserting that they had misled her to her detriment by falsely assuring her that she would be fully compensated for her services.

Bruner Health failed to timely respond to the discovery requests, and, on May 3, 2000, Mrs. West filed a motion to compel a response. Before a hearing could be held on this motion, the Bruners attempted to have the litigation removed to the United States District Court for the Western District of Louisiana. By an order dated July 7, 2000, the federal district court remanded the matter to the state district court. While the matter was pending in federal court, CRM answered the suit and filed a cross-claim against Bruner Health and Justin Bruner. Mrs. West filed a second amending petition on May 7, 2001, wherein she asserted her employment relationship with CRM.

The trial court scheduled a May 31, 2001 hearing to consider Mrs. West's motion to compel and Bruner Health's exceptions. When the trial court called the matter for hearing, counsel for the parties announced that they had entered into an

agreement to continue the hearing on both the motion to compel and the exceptions and that Bruner Health and the Bruners[3] would respond to the discovery requests within fourteen days. Based on the submitted agreement, the trial court continued the matters without date.

Bruner Health and the Bruners failed to respond to discovery pursuant to the court-approved agreement, and the trial court scheduled a second hearing on the discovery issue for August 30, 2001. After hearing the arguments of counsel, the trial court concluded that, not only had Bruner Health failed to comply with Mrs. West's discovery requests, but also both Bruner Health and the Bruners were consciously ignoring the proceedings.[4] The trial court then ordered that Bruner Health and the Bruners respond to both the written interrogatories and the motion to produce documents within thirty days; found both Bruner Health and the Bruners in contempt of court; and ordered that they pay Mrs. West $500.00 in attorney fees. The written judgment, executed by the trial court on September 25, 2001, also provided that if the defendants failed to timely provide discovery the trial court would invoke the provisions of La.Code Civ.P. art. 1471 and prohibit them from introducing evidence at the trial on the merits.

Despite the trial court's order and specific warning of the consequences of disobeying the discovery order, Bruner Health and the Bruners again failed to timely respond to the discovery requests. On May 30, 2002, Mrs. West filed a motion requesting that the trial court limit the ability of Bruner Health and the Bruners to introduce evidence at trial. At a June 6, 2002 hearing, the trial court deferred Mrs.

_____

[3]The Bruners were not the parties named in the motion to compel and became party defendants after discovery was instituted.

[4]At no time have the Bruners made a personal appearance in court.

West's request for relief to future proceedings and gave Bruner Health and the Bruners an additional ten days in which to answer the discovery requests. As one might expect by this time, Bruner Health and the Bruners ignored this deadline as well.

On June 14, 2002, Mrs. West again amended her petition, for the last time, seeking additional damages. By a motion filed June 24, 2002, she again asked the trial court to limit the right of Bruner Health and the Bruners to assert defenses at trial. This motion and Bruner Health's exceptions were heard on August 1, 2002, immediately before the beginning of the trial on the merits. Without commenting on its reasons, the trial court rejected the exceptions and stated that it would consider the defense limitation motion "as we go along."

After completion of the evidentiary portion of the trial, the trial court took the matter under advisement. On September 11, 2002, without assigning any reasons for judgment, the trial court executed a written judgment in favor of Mrs. West and against all defendants. The written judgment awarded Mrs. West damages against Bruner Health totaling $331,821.67, which amount represented unpaid salary and commissions of $204,717.62, expenses not reimbursed of $5,438.25, penalties of $56,665.80, and attorney fees of $65,000.00; against CRM totaling $225,950.84, which amount represented unpaid salary and commissions of $139,285.04, penalties of $56,665.80, and attorney fees of $30,000.00; against the Bruners totaling $172,130.51, which amount represented unpaid salary and commissions of $117,130.51, attorney fees of $30,000.00, and general damages of $25,000.00. With the exception of the general damages award, the judgments against CRM and the Bruners were imposed *in solido* with the judgment against Bruner Health. The trial court further rendered judgment in favor of CRM in its cross-claim against Bruner

Health,[5] awarding CRM judgment against Bruner Health for the total amount for which it was cast in judgment. All of the defendants appealed this judgment.

## ASSIGNMENTS OF ERROR

In their appeal, Bruner Health and the Bruners asserted that the trial court erred in (1) rejecting Bruner Health's exceptions, (2) awarding excessive damages against Bruner Health, and (3) rendering judgment against the Bruners individually. CRM asserted in its appeal that the trial court erred in (1) rendering judgment against it for Mrs. West's unpaid salary, (2) rendering judgment against it for Mrs. West's unpaid commissions, (3) rendering judgment against it for penalties, and (4) awarding excessive attorney fees against CRM in Mrs. West's favor.

## BRUNER HEALTH'S AND THE BRUNERS' ASSIGNMENTS OF ERROR

### *Arbitration*

In their first assignment of error, Bruner Health and the Bruners assert that the trial court erred in rejecting Bruner Health's exceptions of lack of subject matter jurisdiction and prematurity regarding the arbitration clause in the 1998 employment contract between Mrs. West and MedAssist. "The failure of a party to arbitrate in accordance with the terms of an agreement may be raised either through a dilatory exception of prematurity demanding dismissal of suit or by motion to stay proceedings pending arbitration." *Albert K. Newlin, Inc. v. Morris*, 99-1093, p. 7 (La.App. 3 Cir. 1/5/00), 758 So.2d 222, 227. "[I]n a situation . . . in which the question of enforcement of an arbitration agreement is introduced into a preexisting matter, the trial court has subject matter jurisdiction to consider the waiver or lack thereof." *Id.* at 226.

---

[5]The cross-claim is erroneously referred to in the judgment as a third-party claim. Additionally, while the cross-claim also named Justin Bruner as a defendant, the judgment is silent as to that claim.

Bruner Health initially filed its exceptions on March 8, 2000. Over a year later, at the May 31, 2001 hearing on the exceptions, counsel for Bruner Health joined with counsel for Mrs. Davis to continue the hearing on the exceptions. In the meantime, the Bruners attempted to have the matter transferred to federal court. At no time did Bruner Health request a stay of the proceedings. Not until the morning of the trial on the merits, almost two and one-half years after Mrs. West filed her original petition, did Bruner Health reassert its exceptions. At that late date, the trial court denied the exceptions and tried the case on the merits. The trial court signed the judgment on the merits on September 11, 2002, and Bruner Health did not appeal the denial of its exceptions until November 15, 2002, when it also appealed the merits of the case.

Initially, we note that "[a]n appeal cannot be taken by a party who confessed judgment in the proceedings in the trial court or who voluntarily and unconditionally acquiesced in a judgment rendered against him." La.Code Civ.P. art. 2085. "The acquiescence that prohibits an appeal, or destroys it when taken, is the acquiescence in a decree commanding something to be done or given. If the thing commanded to be done or given is done or given, there has been acquiescence in the judgment." *Times Picayune Publ'g Corp. v. New Orleans Aviation Bd.*, 99-237, p. 5 (La.App. 5 Cir. 8/31/99), 742 So.2d 979, 982, *writ denied*, 99-2838 (La. 12/10/99), 751 So.2d 257. Importantly, "[a]n appeal can be dismissed at any time by consent of all parties, or for lack of jurisdiction of the appellate court, or because there is no right to appeal, or if, under the rules of the appellate court, the appeal has been abandoned." La.Code Civ.P. art. 2162. "[W]here there is no right to appeal, an appellate court may dismiss an appeal on its own motion." *Guidry v. Sothern*, 98-1152, p. 4 (La.App. 1 Cir. 5/14/99), 734 So.2d 928, 930.

Clearly, by participating fully in the trial on the merits, Bruner Health

acquiesced in the ruling denying its exception and ordering it to proceed to trial. As explained in *Thomas v. Desire Community Housing Corp.*, 98-2097, p. 7 (La.App. 4 Cir. 7/19/00), 773 So.2d 755, 759, under the particular facts of that case:

> [O]ne who claims entitlement to arbitration cannot make a *pro forma* request for it, file a reconventional demand and then sit on his rights for six and a half years, participate in litigation and then after an adverse ruling cry "'Kings-X,' the judgment is invalid for want of arbitration." That is the very antithesis of what arbitration is all about.

Likewise, Bruner Health cannot make a *pro forma* request for arbitration, participate in the litigation process for almost two and one-half years, agree to continue the hearing on its exceptions until the morning of trial, proceed through trial on the merits, and then appeal the arbitration issue after an adverse judgment on the merits of the case. At this late date, Bruner Health has acquiesced in the ruling against it. Thus, Bruner Health is precluded from appealing the arbitration issue.

Furthermore, "a judgment refusing to order arbitration is an appealable, interlocutory ruling . . . due to the irreparable injury that would occur were an immediate appeal not available." *Warren v. Southern Energy Homes, Inc.*, 00-1236, p. 3 (La.App. 3 Cir. 10/4/00), 771 So.2d 214, 215. A ruling denying arbitration need not be in writing before an appeal may be taken. *Id.* In fact, the delays for seeking an appeal from the ruling denying arbitration in the instant case began on August 2, 2002, the day after the trial court's oral ruling. *See id.* Thus, Bruner Health's November 15, 2002 appeal of the arbitration issue was untimely as well. "'When an appellant fails to timely take and perfect an appeal, the appellate court lacks jurisdiction to hear the appeal. In such instances, the appellate court may on its own motion, recognize its lack of authority to entertain the appeal and dismiss same.'" *Berry v. Guidry*, 551 So.2d 852 (La.App. 3 Cir. 1989) (quoting *Sanders v. Adams*, 442 So.2d 865, 866 (La.App. 3 Cir. 1983)).

9

Accordingly, because Bruner Health acquiesced in the judgment on its exceptions and failed to timely file an appeal on the issue, we recognize on our own motion our lack of authority to entertain the appeal as to the arbitration issue and dismiss its appeal to that extent. We note that Bruner Health's appeal as to the remaining issues was timely and that "[c]onfession of or acquiescence in part of a divisible judgment or in a favorable part of an indivisible judgment does not preclude an appeal as to other parts of such judgment." La.Code Civ.P. art. 2085. Thus, we will consider the remainder of its appeal.

### *Damages Award*

Bruner Health and the Bruners admit that they owe Mrs. West at least $16,085.65. However, they assert in this assignment of error that the trial court erred in calculating the amount of commissions owed Mrs. West because she "failed to introduce any credible evidence to prove the amount of additional commissions she claims she is owed." They assert that her calculations are based on "speculation, estimation and exaggeration" and do not support the trial court's award. Thus, Bruner Health and the Bruners limit their damages award complaint to the calculation of commissions due Mrs. West.

The trial court awarded the following amounts against Bruner Health for unpaid commissions:

Commissions earned before October 1, 1998

| | |
|---|---|
| Commissions earned for sale of manual wheelchairs while serving as agent for J.A.B. | $ 4,225.00 |
| Commissions earned for sale of electric wheelchairs while serving as agent for J.A.B. | $ 58,051.24 |

Commissions earned after October 1, 1998

| | |
|---|---|
| Commissions on electric wheelchairs | $ 3,628.43 |

10

| Commissions on home medical equipment | $ 2,990.06 |
| Commissions on supplies for diabetic patients | $ 125,163.60 |

The October 1, 1998 date is significant because before that date Mrs. West's compensation as agent was forty percent of *profits* from collected sales. Thereafter, her commissions were based on the total allowable sales revenue.

At trial, Mrs. West provided the trial court with extensive documentation concerning her commissions and expenses. However, she readily admitted in her testimony that the agent commission calculations were based on the gross sale price of the wheelchairs, and not the profit from each sale. She explained that Bruner Health's failure to provide her with discovery prevented her from being able to calculate the actual profit and that her calculations were based on the records available to her. She also acknowledged that her calculations of commissions on diabetic supplies were based on certain assumptions. Specifically, she assumed that the patients who had made their initial purchases from her continued to receive the supplies on a regular basis. This assumption was also necessary because of Bruner Health's failure to provide discovery.

Citing *Neely v. Turner*, 97-1125, p. 5 (La.App. 3 Cir. 2/4/98), 707 So.2d 1298, 1302, *writ denied in part and judgment vacated in part on other grounds*, 98-1184 (La. 6/5/98), 720 So.2d 673, Bruner Health and the Bruners argue that "only actual damages are allowable and must be established with reasonable certainty, not by remote and conjectural estimates of loss." Clearly, the evidence was sufficient to establish with reasonable certainty the J.A.B. profits from the sale of the wheelchairs and therefore was sufficient to establish the appropriate commissions. Concerning the sale of diabetic supplies, we note that the court in *Neely* also stated that "when there is a legal right to recover damages, but the amount cannot be established with

11

precision, the courts have reasonable discretion to make an assessment based upon all of the facts and circumstances of the particular case." *Id.* We find that with regard to the award for commissions on the sale of diabetic supplies, the trial court did not abuse its reasonable discretion in accepting Mrs. West's assumptions and awarding the full amount based on her testimony and the exhibits presented. This is particularly true given the flagrant disregard of the trial court's orders by Bruner Health and the Bruners, which disregard prevented Mrs. West from producing exact values.

Mrs. West claimed that her unpaid commission on each of the thirteen manual wheelchairs she sold while acting as agent for J.A.B. was $325.00. Therefore, the actual sale price of each wheel chair was $812.50 (325.00 ÷ 0.40). In her claim for post-October 1, 1998 commissions, she lists the cost of a standard wheelchair as $324.69. Using this information, one can calculate the profit from the sale of a wheelchair by subtracting the cost from the sale price (812.50 ! 324.69). Thus calculated, the profit is $487.81. Forty percent of that amount is $195.12. We conclude that the proper commission on the sale of the thirteen J.A.B. manual wheelchairs is $2,536.56, and not $4,225.00, as awarded by the trial court. We therefore reduce the trial court's award in this regard to $2,536.56.

The percentage of profit for the sale of each manual wheelchair is sixty percent (487.81 ÷ 812.50). It would appear appropriate to apply that same percentage to the purchase of the electric wheelchairs. Using Mrs. West's testimony and exhibits, we find that the gross price of the electric wheelchairs was $145,128.10 (58,051.24 ÷ 0.40). The profits from the sales of those wheelchairs was $87,076.86 (145,128.10 x 0.60). Forty percent of that amount is $34,830.74. We conclude that the proper commission on the sale of the J.A.B. electric wheelchairs is $34,830.74, and not $58,051.24, as awarded by the trial court. We therefore reduce the trial court's award

12

in this regard to $34,830.74. Because Bruner Health and the Bruners have challenged on appeal only the commission awards, we need not consider the correctness of the other awards.

### The Bruners' Personal Liability

Finally, the Bruners contend that the trial court erred in entering judgment against them individually. The trial court found that the Bruners engaged in "fraudulent conduct," and we find that the record supports this finding and that it is not clearly wrong. Importantly, "[i]f an officer or agent of a corporation through his fault injures another to whom he owes a personal duty, the officer or agent is liable personally to the injured third party, regardless of whether the act culminating in the injury is committed by or for the corporation and regardless of whether liability might also attach to the corporation." *Laurents v. La. Mobile Homes, Inc.*, 96-976, pp. 12-13 (La.App. 3 Cir. 2/5/97), 689 So.2d 536, 543. Thus, we reject this assignment of error.

### CRM'S ASSIGNMENTS OF ERROR

### CRM's Liability for Unpaid Salary and Commissions

In its appeal, CRM asserts that it does not owe any additional amounts as salary or commissions to Mrs. West pursuant to La.R.S. 23:631(A)(1)(b), which provides in part:

> Upon the resignation of any laborer or other employee of any kind whatever, it shall be the duty of the person employing such laborer or other employee to pay *the amount then due under the terms of employment . . . .*

(Emphasis added.)

CRM concedes that it was Mrs. West's co-employer along with Bruner Health. It also acknowledges in its brief that "[t]he terms of plaintiff's employment include the agreement between Bruner [Health] and CRM as to the division of responsibilities

13

for processing the payroll." However, CRM asserts that the amounts of Mrs. West's salary and commissions were controlled completely by the agreement between Mrs. West and Bruner Health, to which CRM was not a party. CRM also asserts that it was responsible only for issuing checks in the amounts submitted by Bruner Health and that it is not disputed that it paid Mrs. West all of the money Bruner Health deposited with it and indicated she was due. Thus, CRM contends that "[a]ny amounts which Bruner [Health] failed to submit to CRM, and failed to deposit adequate funds to cover were not 'amounts then due' to plaintiff by CRM under La.R.S. 23:631." Additionally, CRM points out that the Bruners notified it that Mrs. West had resigned effective June 2, 1999, and contends that "[a]lthough that information now appears to have been erroneous, it does not change the irrefutable fact that, as far as CRM was concerned, the employment relationship with plaintiff was terminated effective June 2, 1999."

Essentially, CRM does not contest as erroneous the *amounts* claimed due by Mrs. West as salary but contests her assertion that the amounts claimed due are owed by it. While CRM does contest the amounts claimed due by Mrs. West as commissions, which issue we have addressed under the Bruner assignments of error, it asserts that any "bad acts" attributable to the Bruners regarding commissions should not be imputed to CRM.

However, CRM confuses the existence of its obligation to Mrs. West with the reason that its obligation was not fulfilled. As an employer of Mrs. West, pursuant to La.R.S. 23:631(A)(1)(b), it was CRM's "duty . . . to pay [Mrs. West] the amount then due under the terms of employment." The fact that Bruner Health failed to deposit and submit to CRM money due Mrs. West and erroneously notified CRM that Mrs. West had resigned did not abrogate CRM's duty to Mrs. West or her entitlement to

14

such money from CRM. In other words, vis-à-vis Mrs. West, Bruner Health and CRM, as co-employers, each owed Mrs. West her full salary and commissions and were, therefore, solidarily liable to her in that regard. The *method* in which Bruner Health and CRM chose to divide payroll responsibilities in fulfilling their obligation to Mrs. West simply created a separate obligation vis-à-vis each other but did not eviscerate their coextensive obligation to Mrs. West.

"A failure to perform a solidary obligation through the fault of one obligor renders all the obligors solidarily liable for the resulting damages. In that case, the obligors not at fault have their remedy against the obligor at fault." La.Civ.Code art. 1800. Thus, the trial court properly awarded damages to Mrs. West against CRM based on its obligation to Mrs. West. The trial court also properly recognized the fault of Bruner Health through its grant of CRM's cross-claim. Thus, we reject these assignments of error.

### CRM's Liability for Penalty Wages

In any event, CRM contends that, because it was in good faith, the trial court erred in awarding penalty wages against it. Specifically, La.R.S. 23:632 provides:

> Any employer who fails or refuses to comply with the provisions of R.S. 23:631 shall be liable to the employee either for ninety days wages at the employee's daily rate of pay, or else for full wages from the time the employee's demand for payment is made until the employer shall pay or tender the amount of unpaid wages due to such employee, whichever is the lesser amount of penalty wages. Reasonable attorney fees shall be allowed the laborer or employee by the court which shall be taxed as costs to be paid by the employer, in the event a well-founded suit for any unpaid wages whatsoever be filed by the laborer or employee after three days shall have elapsed from time of making the first demand following discharge or resignation.

As set forth above, CRM is solidarily liable with Bruner Health for Mrs. West's salary and commissions. Revision Comment (b) to La.Civ.Code art. 1800 explains: "Obligors of a solidary obligation represent each other with regard to the obligee.

What is done by one of them is considered to have been done by the others." Revision Comment (c) further explains: "An obligor not at fault who pays damages arising from the fault of another solidary obligor may bring an action to compel the latter to reimburse him." Accordingly, the trial court did not err in awarding penalty wages against CRM. As set forth above, CRM's remedy was through its cross-claim against Bruner Health, which the trial court granted.

### Amount of Attorney Fees Awarded

In its final assignment of error, CRM asserts that the parties stipulated at trial that, should the court enter judgment against CRM, the parties would later be given an opportunity to "separate out" the attorney fees attributable to Bruner Health and those attributable to it. Thus, CRM asserts that the trial court erred in signing Mrs. West's submitted judgment without conducting a hearing on the issue.

However, CRM never availed itself of the opportunity to "separate out" the attorney fees at any time during the trial or prior to judgment, nor did it file a motion for new trial on the issue following judgment. In any event, it was not necessary to "separate out" the attorney fees because CRM and Bruner Health were solidarily liable for the attorney fees in the first instance and the trial court then granted CRM's cross-claim against Bruner Health in full, thereby allowing the recoupment of any and all attorney fees paid by CRM.

### DISPOSITION

For the foregoing reasons, we amend the judgment rendered against Bruner Health Group, Inc. to reduce the award for unpaid commissions due from the sale of manual wheelchairs prior to October 1, 1998, to $2,536.56, and we reduce the award for unpaid commissions due from the sale of electric wheelchairs prior to October 1, 1998 to $34,830.74. We affirm the judgment of the trial court in all other respects and

16

tax all costs of these proceedings to Bruner Health Group, Inc., Corporate Resource Management, Inc., Justin Bruner, and Jennifer Bruner.

**AFFIRMED AS AMENDED.**

NUMBER 03-152

COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA

SHELLEY W. WEST

      Plaintiff - Appellee

Versus

BRUNER HEALTH GROUP, INC., ET AL.

      Defendants - Appellants

      On appeal from the Tenth Judicial District Court [Number 72091, Division B], for the Parish of Natchitoches, State of Louisiana; the Honorable Monty L. Doggett, District Judge, presiding.

Woodard, J., dissenting in part.

      I respectfully dissent from the majority's assessment of penalty wages against CRM. There is no evidence in or, even, inference from the record which supports this determination. Casting a party as a solidary obligor regarding liability does not *a priori* or legally, support automatically casting it with penalty wages without evidence of *its* bad faith.[1]

      The majority's basis for concluding that CRM and Bruner are solidarily liable to Ms. West for penalty wages comes from a portion of La.Civ.Code art. 1800's *comments* (b) and (c):

>       Obligors of a solidary obligation represent each other with regard to the obligee. What is done by one of them is considered to have been done by the others. An obligor not at fault who pays damages arising from the fault of another solidary obligor may bring an action to compel the latter to reimburse him.

---

[1]*See* La.Civ.Code art. 1801.

Thus, say the majority: "Accordingly, the trial court did not err in awarding penalty wages against CRM. As set forth above, CRM's remedy was through its cross-claim against Bruner Health, which the trial court granted."

However, La.Civ.Code art. 1801 provides:

> A *solidary obligor may raise against the obligee defenses* that arise from the nature of the obligation, or *that are personal to him*, or that are common to all the solidary obligors. He may not raise a defense that is personal to another solidary obligor.

(Emphasis added.)

While La.R.S. 23:632 imposes unconditional liability for penalty wages, the statute is penal in nature, requiring that we construe it strictly. [2] This court has consistently recognized an equitable defense of "good faith" which may relieve the employer of liability for penalty wages. In fact, *"the jurisprudence has almost uniformly imposed a requirement that penalties not be imposed on the employer when it presents a good faith, non-arbitrary defense to its liability for unpaid wages ."*[3] (Emphasis added.)

In the instant case, the evidence showed that CRM had no way of knowing that Ms. West was owed any wages beyond what it had paid her. The contract between CRM and Bruner clearly defined each's role. CRM's role was very limited. Basically, Bruner out-sourced CRM to handle its payroll and insurance matters. Bruner would send funds, to CRM, which it deposited and used to issue checks to the employees based, solely, on the information Bruner gave it concerning the salary that was due to each employee.

CRM closed Ms. West's employee file on June 2, 1999, the date which Bruner instructed it that she resigned. CRM had no way of knowing that there were any problems until it received Ms. West's resignation/demand letter six months later, stating her date of resignation as November 23, 1999. Furthermore, even after CRM received Ms. West's letter, it was not clear that she was making a demand upon CRM.

---

[2]*Carriere v. Pee Wee's Equip. Co.*, 364 So.2d 555 (La.1978).

[3]*Hebert v. Ins. Ctr., Inc.,* 97-298, p. 9, 706 So.2d 1007, 1013, *writ denied*, 98-353 (La. 3/27/1998), 716 So.2d 888, (citing *Carriere v. Pee Wee's Equip. Co.*, 364 So.2d 555 (La.1978); *Jones v. Hebert & LeBlanc, Inc.*, 499 So.2d 1107 (La.App. 3 Cir. 1986)).

2

The letter was directed to Mr. and Mrs. Bruner, and as Ms. Janice Edwards, CRM's president, testified, CRM believed they were simply receiving a courtesy copy.

CRM's interpretation was reasonable since the stated amount in her demand/resignation letter was not consistent with what her base salary would have been from the time CRM was informed that she resigned until her actual resignation date. The amount was inconsistent because, in fact, Bruner had paid her part of her salary *after* it informed CRM that she resigned; it did not make the payments through CRM but through other companies it owned. Accordingly, CRM never knew about these payments. Thus, the demand letter reasonably indicated that Bruner had paid her, at least, some amounts, independently, after CRM had closed her file.

Specifically, while Ms. West stated a specific minimum amount that she believed she was owed, her letter indicates that she was unable to calculate her unpaid wages, commissions, etc., until Bruner sent her the necessary printouts. And since Bruner never complied with discovery, Ms. West was forced to calculate the amounts she was owed from the limited information she had in her own records. Accordingly, CRM did not receive the final amount Ms. West was claiming until the day before trial. Therefore, CRM had no way of verifying that any, all, or some portion of the amount she claimed was actually owed to her.

Moreover, CRM had no reason to distrust Bruner's information and, therefore, no reason to contact Ms. West directly. In other words, the record shows that there were no "red flags" to raise CRM's suspicion of a problem, particularly because Bruner, specifically, instructed Ms. West not to contact CRM concerning her failure to be paid.

Furthermore, it is clear from the record that CRM was cooperative and forthcoming with information in its possession. Even Ms. West's counsel agreed that it should not be penalized for any of Bruner's bad acts, such as its failure to comply with discovery.

Given CRM's lack of knowledge and no indication that there was a problem, either, from Ms. West or Bruner, it is not rational or fair to find CRM to have been in bad faith. However, it does not appear that the majority performed this analysis.

I would reverse this portion of the trial court's judgment, as I believe the law requires us to recognize CRM's good faith defense regarding penalty wages.